**Dr. Daniel C. YORK, et ux., Plaintiffs,**

v.

**GEORGIA–PACIFIC CORPORATION, Defendant.**

**No. WC81–160–LS–P.**

United States District Court, N.D. Mississippi, W.D.

May 9, 1984.

 

Paul M. Moore, Jr., Calhoun City, Miss., Grady F. Tollison, Oxford, Miss., for plaintiffs.

James C. Mayo, Louisville, Miss., S.T. Rayburn, Oxford, Miss., for defendant.

## MEMORANDUM OPINION

SENTER, Chief Judge.

This is a diversity case in which the plaintiffs claim lack of mental capacity in Dr. Daniel C. York at the time he entered into a Lease and Timber Sale Agreement with Georgia-Pacific Corporation and that the terms of the Lease and Timber Sale Agreement are unconscionable. The defendant has denied that Dr. Daniel C. York lacked mental capacity at the time of execution of the Lease and Timber Sale Agreement and denied that the Lease and Timber Sale Agreement is unconscionable. In addition, the defendant asserts that Dr. Daniel C. York's claim is barred by the statute of limitations and the doctrines of ratification, waiver, laches, and estoppel.

This cause came on for trial to the court on November 28, 1983. Having heard the testimony of the witnesses and having received the documentary evidence submitted for the record and the stipulations entered into between the parties in the final Pretrial Order, the court now makes its Findings of Fact and Conclusions of Law as required by Rule 52 of the Federal Rules of Civil Procedure.

### Findings of Fact

Dr. Daniel York was a practicing dentist in Fort Worth, Texas, until 1954. He began acquiring timberland in Calhoun, Yalobusha, Grenada, and Webster Counties within the State of Mississippi in the early 1940's. Dr. York testified that through the years, he acquired approximately 10,000 acres of such land, 8,000 acres of which is the subject of the Lease and Timber Sale Agreement that resulted in the present lawsuit. Dr. York retired from dentistry in 1954 and moved to Bellefontaine, Mississippi.

During the late 1950's, Dr. York began to contemplate the possible donation of his lands to the University of Mississippi for the purpose of generating scholarship funds to those financially unable to attend the college. In the 1960's, Dr. York began considering the idea of leasing the timber to a large corporation. It was Dr. York's desire that a timber company lease the lands to enhance the timber value of the property so that the University of Mississippi would have a valuable resource in Dr. York's donation.

In the spring of 1970, Dr. York became actively interested in leasing this land. Among the timber companies operating in the area of Dr. York's land were Georgia-Pacific Corporation (hereinafter Georgia-Pacific), International Paper Company (hereinafter International), and Weyerhaeuser Corporation (hereinafter Weyerhaeuser). York approached Weyerhaeuser in regard to a possible lease of his timberland in early 1970. He was informed that Weyerhaeuser was not leasing any land in that area at that time.

Thereafter, Dr. York employed Jim Peterson, an independent forester and former employee of Georgia-Pacific, regarding a possible lease of his land. Mr. Peterson contacted International, who became interested in obtaining such a lease. Dr. York and International could not agree, however, on some of the terms of the proposed lease. In a letter to Dr. York dated April 23, 1970, Peterson advised Dr. York that International might agree to a $450,000.00 payment for the standing timber on his land and $2.50 payment per acre per year rental for the use of his land. No lease was ever consummated between Dr. York and International, but Peterson was paid $200.00 for his efforts in attempting to negotiate the lease.

No attempt was made by Dr. York to lease the land in 1971. In the summer of 1972, Peterson visited Dr. York at his home in Bellefontaine, Mississippi. Peterson testified that during this meeting, Dr. York handed him a draft of a proposal for a lease of 8,000 acres and asked Peterson to see if he could "peddle" the proposal to any of the timber companies in the area.

This proposal was later typed in the form of a letter, dated June 27, 1972, addressed to Mr. James E. Peterson and signed by Dr. Daniel C. York. The testimony was somewhat unclear as to who prepared the final typed draft of the proposal. The uncontradicted testimony established, however, that the contents of the letter were determined by Dr. York. The terms and conditions found in the letter include the following:

1. LENGTH OF LEASE PERIOD: Not less than 50 years.

2. PRICE: $5,000.00 at the inception of the Lease with a $4.50 per acre per year rental. The annual increase or decrease in rental shall be determined by the percentage of increase or decrease in the wholesale price index.

3. TAXES: The buyer shall pay ad valorem taxes up to $1.00 per acre per year.

4. OIL, GAS AND MINERAL RIGHTS: The seller retains mineral rights with

buyer to receive 7½% of net income from said rights.

5. HUNTING AND FISHING RIGHTS: Hunting and fishing rights were transferred to the buyer with the seller to receive the benefit of one-half of all income derived therefrom.

6. EXCLUSIONS: Farm lands are excluded from the Lease.

Peterson further testified that he at no time advised Dr. York on the proposal but merely undertook the task of "peddling" the proposal to the timber companies.

In furtherance of this task, Peterson contacted Georgia-Pacific sometime prior to June, 1972, regarding the possibility of its leasing the York lands. Georgia-Pacific then began an evaluation of the lease, including the performance of a cruise of the York property, to determine the feasibility of such a lease.

Georgia-Pacific conducted this cruise of the York land sometime during May of 1972. Dr. York contends that he was not informed that Georgia-Pacific was going to conduct, or did conduct, such a cruise. Mr. Peterson testified that he advised Dr. York of Georgia-Pacific's intent to undertake a cruise of the timber on his property. Dr. York, however, denies such, and claims that he was never informed and did not know that Georgia-Pacific would or had cruised his timber. The court finds it difficult to believe that a large timber owner would be ignorant of the fact that a timber company would first conduct a cruise of the land before entering a timber lease covering several thousand acres. This is especially hard to believe in light of Dr. York's own testimony that during the negotiations with International, he became familiar with timber cruises—having paid half of the cost of such a cruise. He further testified that, in his opinion, any competent purchaser or lessee of real estate would view the subject property before purchasing or leasing it. The court thus accepts the testimony of Mr. Peterson in this regard and finds that Dr. York was aware that a timber cruise would be and was conducted by Georgia-Pacific.

Dr. York contends that he was mentally incapable of handling his business transactions during the period of the negotiations and execution of the lease. During the summer of 1972, Dr. York, according to his testimony, began to undergo physical as well as mental problems. He began experiencing severe headaches which were not relieved by medication. Additionally, according to Dr. York, his wife of six years began to constantly complain about the condition of their home, causing Dr. York to undergo physical and mental pressure. As a result of these problems, Dr. York began to experience stress and anxiety, triggering a bout of depression. Dr. York first attempted to self-medicate himself to alleviate this anxiety and depression. He began prescribing antidepressants for himself and began to take both Valium and sleeping pills. Dr. York's headaches, depression, and self-medication resulted in his hospitalization on July 30, 1972, at the University Medical Center in Jackson. The physician treating Dr. York requested that he be transferred to the psychiatric ward of the medical center. Dr. York remained in the psychiatric ward until August 9, 1972.

While in the psychiatric ward, Dr. York was treated by Dr. James Williams, a psychiatrist practicing at the University Medical Center. Dr. Williams testified that during this period, Dr. York was suffering from a major depressive episode. This episode, he determined, was caused by an anxiety neurosis.

Dr. Williams continued to see Dr. York on an outpatient basis until November of 1972. Dr. Williams testified that he did not observe any improvement in Dr. York's mental condition during this period. He further testified that it would have taken Dr. York anywhere from three months to a year to recover from this major depressive episode.

Dr. Williams was of the opinion that such a depression could affect a man's business judgment and/or his motivation to exercise his judgment. Dr. Williams could not testify, however, as to whether or not Dr.

York's business judgment, or lack of motivation, affected his negotiations and execution of the Lease and Timber Sale Agreement with Georgia-Pacific Corporation. In fact, Dr. Williams testified that Dr. York discussed the Georgia-Pacific lease with him throughout his treatment and had he felt that Dr. York was not capable of entering into the lease agreement, he would have so advised. Dr. Williams, however, did not ever question Dr. York's ability to enter into the lease.

Dr. Carmen Simon, another psychiatrist who testified for the plaintiffs, essentially corroborated the testimony of Dr. Williams. Dr. Simon testified that she examined Dr. York in 1981 and concluded from this diagnosis that Dr. York had been a depressive since 1963. She further testified that at the bottom of a depressive cycle, there could possibly be judgment impairment. Dr. Simon testified, however, that this did not mean that depressives were incapable of handling business transactions. In fact, Dr. Simon was of the opinion that Dr. York's ability to propose the terms contained in the lease would appear to indicate that his business judgment was not affected by the depressive episode which he suffered in 1972.

Gloria Hamilton, a clinical social worker and therapist, testified that she first saw Dr. York in September of 1981. She had visited with Dr. York a total of twenty-six times. It was her opinion that Dr. York has suffered from depressive episodes since childhood.

The completed Lease and Timber Sale Agreement was signed by Dr. York in Calhoun County, Mississippi, on October 12, 1972. The agreement was signed in the office of Henry Lackey, an attorney whose office is located in Calhoun City. The only testimony before the court with respect to Dr. York's mental ability on the date of the execution of the lease is that of Mrs. York and Henry Lackey. Mrs. York and Mr. Lackey both testified that they did not observe any mental or physical deficiency or impairment affecting Dr. York's ability to enter into the lease. Although Mr. Lackey

testified that he had no independent recollection of the meeting held in his office on October 12, 1972, he did state that had he thought Dr. York's mental ability was in any way affected, he would not have allowed Dr. York to sign the lease.

Additionally, the court cannot ignore the fact that Dr. York, by his own testimony, has suffered such depression since his early childhood and has continued to suffer from such until the present time. Dr. York has, however, always managed all of his own business transactions and was able to accumulate approximately 10,000 acres of land. Furthermore, the evidence presented to the court establishes that Dr. York has participated in numerous business transactions during the period from 1972 until the date of this trial. Yet, the Georgia-Pacific lease is the only transaction which Dr. York has attempted to set aside.

Having weighed all of the evidence, the court finds that Dr. York was not suffering from a mental incapacity at the time of the execution of the lease. In fact, the court is of the opinion that Dr. York was not suffering from any mental weakness which would affect his ability to intelligently enter into business transactions.

Having determined that Dr. York did not lack the necessary mental capacity to enter into the lease, the court will now consider the evidence relevant to plaintiffs' claim of unconscionability. The thrust of Dr. York's argument is that he received no front-end payment for the standing timber. Georgia-Pacific, on the other hand, argues that payment for the standing timber was incorporated into the lease via a rental payment per acre nearly twice that of the actual rental value of the property, a front-end payment of $5,000.00 and the elimination of the limit normally placed on the Wholesale Price Index increase.

On August 31, 1972, R.G. Whitehead, in a letter addressed to Mr. James E. Peterson, made an offer on behalf of Georgia-Pacific to lease Dr. York's land. This offer incorporated exactly those terms and conditions found in Dr. York's letter on June 27, 1972. Dr. York and Mr. Peterson accepted the lease offer on August 31, 1972, by signing and dating the Whitehead letter.

The lease has as its effective date September 1, 1972. The lease instrument, however, was not prepared and presented to Dr. York until October. Dr. York and his wife executed the lease on October 13, 1972, in the office of Henry L. Lackey, Dr. York's attorney. Mr. Lackey witnessed its execution. James Mayo, attorney for Georgia-Pacific, performed title work to ascertain the correct legal descriptions to be attached as exhibits to the lease. Once the title work was completed, the lease was executed by Georgia-Pacific.

The lease was again presented to Dr. York and his wife in the office of Mr. Henry Lackey on December 16, 1972. When the final prepared lease was presented to Dr. York, he questioned one of the provisions. This provision resulted in the alteration of the tax liability on the timber product in favor of Dr. York. This alteration was, thereafter, initialed on the face of the lease by the plaintiffs. At that time, the lease was fully executed and delivered, and the memorandum of recording was signed.

Two events occurred in 1974 which are material to the issues in this case. First, Dr. York contacted Georgia-Pacific and requested an adjustment in the computation of the Wholesale Price Index increase in his rental income. The exhibits presented to the court reflect that this was resolved in Dr. York's favor. Second, Dr. York donated all of the lands under the lease to Mississippi College. The deeds to Mississippi College recited the terms of the Lease and Timber Sale Agreement in great detail. By these deeds, Dr. York transferred all rights and obligations arising under the lease to Mississippi College, reserving in himself an interest in the rental income. In order to convey the property to Mississippi College, Dr. York first had to obtain a waiver by Georgia-Pacific of its right, pursuant to the lease, of first option to purchase.

Throughout the term of the lease, Dr. York accepted all rental payments and corresponded with Georgia-Pacific about cer-

tain rights and obligations arising under the lease agreement. Specifically, Dr. York corresponded with Georgia-Pacific and/or James Mayo on October 5, 1972 (advising that he had read the lease and doubted the providence of it, and discussing the effect of the Wholesale Price Index on his rental payments); March 11, 1974 (discussing the lack of a front-end payment and the reliance placed on fluctuations in the Wholesale Price Index); December 19, 1975 (regarding the calculation of the Wholesale Price Index increase in his rental payment); November 2, 1976 (requesting payment after January 1, 1977, for income tax purposes); January 13, 1977 (regarding the calculation of the Wholesale Price Index increase in his rental payment); November 26, 1977 (requesting payment after January 1, 1978, for income tax purposes); April 5, 1978 (regarding the Wholesale Price Index increase in his rental payment).[1] Throughout this time, Dr. York never acted in derogation of the lease agreement and never voiced any dissatisfaction with the lease to Georgia-Pacific.

The letters from Dr. York to both Georgia-Pacific and James Mayo, the detailed treatment of the lease in the deeds to Mississippi College, and the treatment of the lease payments in Dr. York's tax returns lead this court to the conclusion that Dr. York has at all times understood the effect of this Lease and Timber Sale Agreement.

The first dissatisfaction regarding the lease registered by Dr. York to Georgia-Pacific was by letter dated February 12, 1981. This letter was from Robert Jackson, an attorney, to Georgia-Pacific advising it that Dr. York should have received front-end money for the standing product at the inception of the lease. It was Dr. York's testimony that he had not realized, until 1980, that he was entitled to front-end money. This fact was brought to his attention when Dr. Bennett York, his nephew, began negotiating with Georgia-Pacific for another lease and front-end money was offered.

Dr. Bennett York testified that during a discussion with Richard Kennedy, an employee of Georgia-Pacific, he was told that Daniel York was being paid such a small rental payment for his land because he had been "paid up front" for his timber. Kennedy denied at trial having made this statement. Additionally, the evidence showed that in 1979, in accordance with the increase in the Wholesale Price Index, Dr. York was receiving approximately $9.00 per acre per year in rental payments.

This court finds that the evidence does not support Dr. York's contention that he was not aware that he was entitled to a front-end payment until 1980. First, prior to the Georgia-Pacific lease, in Dr. York's negotiations with International, a $450,000.00 front-end payment was discussed. Second, Jim Peterson testified that Dr. York did not want front-end money. Third, Mary Jesse Bolan, Dr. York's accountant, testified that Dr. York would not have accepted front-end money due to the tax consequences of such a payment. In fact, in a previous sale of land to Georgia-Pacific, Dr. York spread the purchase price over a ten-year period in order to lessen his tax liability. Fourth, in his 1972 tax return, Dr. York represented to the Internal Revenue Service that he received $557,851.00 for his standing timber. This allowed Dr. York to treat the payments received in the first ten years as capital gains, rather than ordinary income. Fifth, contrary to the customary lease requiring front-end payment, Mr. Whitehead testified that Dr. York's proposal requested that in lieu of a front-end payment for the standing timber, Dr. York should receive a $5,000.00 front-end payment, a $2.00 increase in the $2.50 per acre rental value, to be increased commensurate with the Wholesale Price Index, and removal of the customary $10.00 limitation on the increase in per acre rental. Finally, Dr. York testified that he felt he had made a "bad deal" in October of 1972. This was corroborated by the testimony of Mrs. York and Don Bell.

---

1. The correspondence between Dr. York and Georgia-Pacific and/or James Mayo is attached as Appendix A to this opinion. The Appendix is omitted from the published opinion.

Dr. York asserts that his failure to ask for front-end money and his failure to complain at an earlier date about the lack of a front-end payment are attributable to his episode of severe depression. The testimony of plaintiffs' experts, however, was that Dr. York suffered from intermittent episodes of depression. Dr. Williams testified that the episode of depression which Dr. York was suffering in 1972 would have lasted approximately six months to one year. Plaintiffs' own evidence, therefore, does not support Dr. York's contention that he failed to complain about the lack of a front-end payment due to his depression. Clearly, Dr. York was not continuously depressed from 1972 until 1981.

In support of their opposing contentions regarding the adequacy of the consideration by Georgia-Pacific to Dr. York, both plaintiffs and defendant used expert testimony. The court must, at this point, note that there exists a great disparity between the value placed on the timber by the Yorks' experts and that placed on the timber by Georgia-Pacific's experts. The court must, therefore, determine the appropriate weight to be given to each evaluation.

Plaintiffs first presented the testimony of Don Bell, a consulting forester formerly employed by Georgia-Pacific as district manager. Essentially, Mr. Bell testified as to the market value of the standing timber on Dr. York's land at the time of the execution of the Lease and Timber Sale Agreement. In ascertaining the quantity of timber on Dr. York's land, Bell depended upon the cruise sheets prepared by Georgia-Pacific subsequent to its cruise of Dr. York's timberland in May of 1972. To determine how much timber had been severed from Dr. York's land between 1973 and 1981, Bell referred to the cutting records prepared by Georgia-Pacific. Essentially, for each stand of timber, there are four types of inventory: pine saw timber, pine pulpwood, hardwood saw timber, and hardwood pulpwood. Saw timber is measured by the thousand board feet and pulpwood is measured in cords. Bell's analysis of the value of the timber standing on Dr. York's land on September 1, 1972, was as follows:

1. Pine Sawlogs—6,785,000 on land—valued @$70/M = $474,950.00;

2. Hardwood Sawlogs—3,707,000 on land—valued @$41/M = $151,987.00;

3. Pine Pulpwood—23,951 cords—valued @$8/cd. = $191,608.00;

4. Hardwood Pulpwood—3,317 cords—valued @$4/cd. = $13,269.00;

TOTAL VALUE:    $831,813.00.

The total value of the remaining standing inventory on Dr. York's land, according to Bell's testimony, is as follows:

1. Pine Sawtimber—2,050,325 bd. ft.—valued @$145/M = $279,297.12;

2. Hardwood Sawtimber—NONE;

3. Pine Pulpwood—22,937.77 cords—valued @$10/cd. = $229,377.70;

4. Hardwood Pulpwood—1,777.96—valued @$2/cd. = $3,555.92;

TOTAL VALUE:    $512,230.74.

It must be noted, however, that these figures represent gross market value and do not take into into consideration the costs incurred by Georgia-Pacific.

Plaintiffs' second expert witness was Mr. Frederick E. Beckett. Mr. Beckett is a consulting engineer. He has designed sewerage systems and has done surveying and made preliminary designs for a papermill. Additionally, Mr. Beckett has received a degree from Mississippi State University in agricultural engineering.

Mr. Beckett testified that Dr. York gave a value of $2,039,000.00 for the lease and received a value of only $414,660.00. Mr. Beckett testified that his opinion as to what Dr. York gave was formed on the basis of two components: the value of the land and the timber value. He testified that the land value was $1,244.891.00 and the timber value was $831,813.00. Beckett arrived at the timber value figure by multiplying the total number of acres covered by the lease by $125.00 per acre. He then discounted the total due to the fact that Dr. York is to receive the land back at the end of the fifty-year lease period. Beckett fur-

ther testified that he arrived at the $125.00 per acre figure by checking comparable sales in Calhoun County during 1972, none of which reflected a figure of less than $100.00 per acre.

Beckett did not, however, use comparable sales from Webster, Yalobusha, and Grenada Counties where a substantial portion of Dr. York's land is located. In addition, he admitted on cross-examination that he did not view any of the tracts of land comprising the comparable sales nor did he view Dr. York's land. These facts clearly lessen the weight to be accorded the testimony of Dr. Beckett as to the value of Dr. York's land.

As to the value of the standing timber which Mr. Beckett placed on Dr. York's land, Mr. Beckett used only the figures arrived at by Don Bell. He made no independent valuation of the timber.

The court also notes that in determining the bare land value, Mr. Beckett and Mr. Bell based their calculations on a site index of 85. The undisputed testimony in this action reveals Dr. York's land to have had a site index of 70. Thus, Mr. Beckett's and Mr. Bell's valuations were somewhat overstated.

Beckett also testified that Dr. York received $414,000.00 in benefits from the lease agreement. He arrived at this figure by taking the present value of an annuity of $4.50 per acre times the number of acres, with an interest rate of 8½% for 50⅓ years. The testimony pointed out, however, that Beckett expressed his per acre per year rental income in constant dollars. Thus, while using an interest rate determined by inflation, no adjustment was made for inflation.

■ It appears to the court that a real interest rate, or an interest rate net of inflation, must be used for discounting purposes. If constant dollars are used together with an interest rate which includes an inflation factor, the result is an understated net present value. The testimony presented to the court establishes that the real interest rate, net of inflation, for forestry investments averages between 2½% to 3½%.

Beckett also failed to include the per acre tax liability which Georgia-Pacific assumed under the lease. The testimony revealed that the tax on Dr. York's land was 40 cents per acre per year. Thus, Dr. York was actually receiving $4.90 per acre per year in rental. Dr. Thomas Straka, expert for the defendant, testified that Beckett's calculation of the benefits received by Dr. York, based upon a real interest rate of 3% and a per acre per year rental of $4.50 per acre plus the tax per acre, would yield net present value benefits in 1972 to Dr. York in the amount of $958,991.51.

R.G. Whitehead, Dr. Thomas Straka, and Mr. Richard Kennedy all testified as witnesses on behalf of Georgia-Pacific. Mr. Whitehead, District Forester for Georgia-Pacific and the person who made the offer to Dr. York to lease his lands, is clearly qualified to testify as to what benefits Georgia-Pacific expected to give and receive under the Lease and Timber Sale Agreement.

Mr. Whitehead testified that the market value of the standing timber on Dr. York's land in 1972 was $466,964.00 and that the rental value of Dr. York's land was approximately $2.50 per acre. In lieu of the front-end payment for the standing timber, Dr. York received a $2.00 increase in per acre rental, plus the elimination of the normal $10.00 limit on the per acre rental increase.

The single common source used by both Mr. Whitehead and Mr. Bell for the determination of the market value of the standing timber was the Mississippi Forestry Commission's Stumpage Price Reports for the year 1972. A schedule of the estimates of value for Dr. York's standing timber, as determined by Don Bell, the Mississippi Forestry Commission, and R.G. Whitehead is as follows:

| | Don Bell | Mississippi Forestry Commission | R. G. Whitehead |
|---|---|---|---|
| Pine Saw Timber/measured board feet | $70.00 | $41.25 | $42.00 |
| Pine Pulp Wood/cord | $ 8.00 | $ 5.06 | $ 5.00 |
| Hardwood Saw Timber/measured board feet | $41.00 | $27.63 | $15.00 |
| Hardwood Pulp Wood/cord | $ 4.00 | $ 2.94 | $ 2.00 |

It is evident from the above figures that Don Bell, plaintiffs' expert, used an inflated price for Dr. York's timber. In contrast, Mr. Whitehead's estimate is closer to that of the Mississippi Forestry Commission. It is also of interest to the court that the value of the timber estimated by Mr. Whitehead ($467,000.00), unlike that estimated by Don Bell ($831,813.00), is similar to Dr. York's estimate of the value reflected in his 1972 income tax return ($557,851.00). Additionally, the court finds it difficult to believe that Georgia-Pacific would prepare an interoffice memorandum prior to the date of the execution of the lease setting forth the value of Dr. York's standing timber for its own use at a purposely deflated price, as argued by plaintiffs. The court cannot, therefore, accept the value given by Don Bell for the standing timber.

The evidence presented to the court established that the value of timber increased an average of 50% between 1972 and 1974. Don Bell took this into consideration in determining the increased benefit to Georgia-Pacific. Mr. Bell attributed the increase in the market value of timber to the construction of two new plants in the area of Dr. York's land. These plants were not under construction in 1972 and, accordingly, may not be considered in determining the value of the lease to each party in 1972.

Mr. Whitehead testified that Georgia-Pacific considered the York lease to be a higher risk lease than those which it would normally assume for two reasons. First, Dr. York's timber stand was not considered to be of high quality. Second, there was no upper limit on the per acre rental value for the first twenty-five years of the lease. In the remaining twenty-five years, per acre rental payments increase or decrease at the rate of ½ of 1% of the fluctuations in the Wholesale Price Index.

Dr. Straka, an expert witness for the defendant, testified that the net present value of the annuity given to Dr. York in 1972, based on the per acre per year rental plus per acre taxes at a real interest rate of 3%, was $1,011,992.57. In addition, Dr. Straka testified that the net present value to Dr. York of the reforestation of the land at the conclusion of the lease was $104,808.15. Adding these sums, Dr. Straka determined that the net present value of the lease to Dr. York in 1972 was $1,116,800.72.

In determining what Dr. York gave to Georgia-Pacific, Dr. Straka first considered the value of the standing timber at the time of the lease. Dr. Straka used the cruise sheets of Georgia-Pacific multiplied by the price of each item of inventory as determined by the Mississippi Forestry Commission's average. From this, he calculated the value of the standing timber to be $513,249.70.[2]

Dr. Straka then determined the value of the bare land received by Georgia-Pacific. In order to determine this value, he first determined the value of the forest land as conveyed. He testified that he placed a generous value of $181.86 per acre on the forest land. It should be noted that this per acre value exceeded that placed on the land by Don Bell, plaintiffs' expert. Dr.

2. The court finds it of interest that Dr. Straka's estimate of the value of the standing timber is also similar to the estimate of the value found in Dr. York's 1972 income tax return.

Straka then multiplied this by the total acreage and arrived at a total value for the forest land of $1,422,872.64.

Dr. Straka then subtracted from the forest land value the value of the timber and the value of site preparation. Using the Mississippi Forestry Commission's prices, Dr. Straka determined the value of the standing timber to be $513,249.70. The cost of site preparation, according to the testimony, is generally $39.15 per acre. When this was multiplied by the acreage covered by the York lease, a total cost for site preparation of $306,309.60 resulted. Dr. Straka subtracted the value of the timber and the value of the site preparation from the forest land value and arrived at a bare land value in 1972 of $603,313.34.

Dr. Straka then testified that the residual land value which Dr. York would receive at the conclusion of the lease must be subtracted from the bare land value. Dr. Straka determined the residual land value to be $136,270.74. By this method, the value of the land which Dr. York gave up was $467,042.60. When this figure is added to the $513,249.70 value of the standing timber, a net present value of the lease to Georgia-Pacific is $980,292.30.

Dr. Straka also testified that by the end of the lease term, Georgia-Pacific may be required to pay nearly one million dollars in annual rent. This is, according to Dr. Straka, indicative of the benefit Dr. York received by foregoing the usual front-end payment in exchange for the lifting of the $10.00 cap in the Wholesale Price Index increase.

In summary, it was Dr. Straka's testimony that Georgia-Pacific gave Dr. York a net present value of $1,116,800.72, and Dr. York gave Georgia-Pacific a net present value of $980,292.30. According to Dr. Straka's testimony, the lease did not result in a windfall to either party. In fact, his calculations show an approximately equal value to the parties.

Richard Kennedy testified that a front-end inventory payment was not made because the rental under the York lease was $2.00 per acre per year higher than that

customary in the area and also because the $10.00 Wholesale Price Index cap was removed. Thus, Dr. York was receiving payment for the standing timber over the term of the lease in the form of an increased per acre rental and a removal of the $10.00 cap.

The proof offered at trial by Georgia-Pacific conclusively demonstrated that Dr. York was concerned with the tax consequences of the lease agreement. The testimony of Jesse Bolan, an accountant who had prepared Dr. York's tax returns since 1955, established that Dr. York did not like anything which cost him much tax-wise. She stated that Dr. York "does not like to pay taxes." She further testified that in 1972, Dr. York told her that the fair market value of the standing timber was $557,-851.00. As a result, that is what she listed as the fair market value of the standing timber when she prepared his tax return for 1972. She also testified that rental income in the lease agreement was calculated in such a way that the first ten years of rental income would be treated as capital gains. This drastically reduced Dr. York's tax liability for only that rental income received after the tenth year would be treated as ordinary income.

Georgia-Pacific also presented the testimony of Mr. Keith Winfield, a certified public accountant with the accounting firm of Watkins, Ward & Stafford. Mr. Winfield made a comparative analysis of Dr. York's tax liability for the years 1973 through 1981, both actual and as it would have been had there been a front-end payment. The results of Mr. Winfield's comparisons are set forth below:

|  | Actual Tax Liability | Tax Liability With Front-End Payment |
|------|------|------|
| 1972 | NONE | $61,321.55 |
| 1973 | $ 5,267.99 | $16,380.18 |
| 1974 | $ 1,037.32 | $15,860.52 |
| 1975 | $ 2,858.66 | $28,531.60 |
| 1976 | $ 6,384.07 | $19,262.97 |
| 1977 | $ 0.00 | $14,759.79 |
| 1978 | $10,176.06 | $26,346.46 |
| 1979 | $ 2,185.50 | $ 7,838.00 |
| 1980 | $ 3,448.00 | $35,624.10 |
| 1981 | $10,765.68 | $42,779.75 |

This comparison clearly shows that Dr. York's tax liability would have been great-

ly increased had he received a front-end payment in the standing product.

Mr. Winfield also testified that the terms of the Lease and Timber Sale Agreement in the action *sub judice* conform to the Internal Revenue Service Revenue Ruling 62–81, 1962–1 CB 153. This 1962 ruling discusses the tax treatment of increased rental payments in lieu of front-end payment for the product. Mr. Winfield testified that he doubted that a person could just stumble across this type of tax advantage. It would appear to the court, therefore, that this Revenue Ruling was used by Dr. York as a guideline when he drafted the lease proposal later presented to Georgia-Pacific.

### Conclusions of Law

There is complete diversity of citizenship in that both the plaintiffs are Mississippi residents and the defendant is incorporated and has its principal place of business in a state other than Mississippi. The matter in controversy is in excess of $10,000.00, exclusive of interest and costs. Accordingly, the court has jurisdiction of this cause pursuant to 28 U.S.C. § 1332.

There is no dispute that a Lease and Timber Sale Agreement was entered into between Dr. and Mrs. Daniel York and Georgia-Pacific Corporation.[3] The parties concede that Dr. York drew up the initial draft of the lease terms. Pursuant to the terms of the lease, Dr. York was to be paid $5,000.00 cash and a $4.50 per acre per year rental to fluctuate at the same rate as the annual average Wholesale Price Index. This rental would not be less than $4.50 per acre per year for the first ten years, and never less than $4.00 per acre thereafter, and for the first twenty-five years would be governed solely by the fluctuations of the Wholesale Price Index. In addition, Georgia-Pacific was to assume the tax liability for the property, which was approximately 40 cents per acre per year.

It is the Yorks' contention that they were never paid any front-end money for the standing product. The assert that the severe depression and stress which Dr. York was experiencing at the time of the execution of the lease caused him, and thus his wife, to enter into this unfair contract. Conversely, Georgia-Pacific Corporation asserts that it considered the lease to include a $5,000.00 front-end payment with a $4.50 per acre per year rental, with no $10.00 cap, apportioned as $2.50 as actual rental and $2.00 as yearly payment for the standing timber.

Plaintiffs have asserted that Georgia-Pacific Corporation has been unjustly enriched by the terms of the lease and that Dr. and Mrs. York should be reimbursed for the value of the standing timber at the time of the lease on two grounds: first, Dr. York's great weakness of mind, together with grossly inadequate consideration, and, second, the contract in and of itself was unconscionable. Georgia-Pacific asserts that Dr. York was not suffering from a weakened mental condition at the time of the execution of the lease. In addition, Georgia-Pacific asserts that the consideration given to the Yorks for this lease was adequate. Georgia-Pacific further asserts that even should this court determine that Dr. York suffered from great mental weakness or that the contract was unconscionable, all of the Yorks' causes of action are barred by the statute of limitations and the equitable doctrines of ratification, waiver, and estoppel.

It is well established in Mississippi that:

> Whenever there is great weakness of mind in a person executing a conveyance of land, arising from age, sickness, or any other cause, though not amounting to absolute disqualification, and the consideration given for the property is grossly inadequate, a court of equity will, upon proper and reasonable application of the injured party, or his heirs, interfere and set the conveyance aside.

---

**3.** It should be noted that the property which is the subject of this timber lease was not homestead property nor was Mrs. York an owner of the property. She merely had a nominal interest in that property.

Judge Story, in *Harding v. Wheaton*, 2 Mason, 378[11] Fed.Cas. No. 6,051, felicitously states the rule as follows: "Extreme weakness [of mind] will raise an almost necessary presumption of imposition; and though a contract, in the ordinary course of things, reasonably made with such a person, might be admitted to stand, yet if it appear to be of such a nature as that such a person could not be capable of measuring its extent or importance, its reasonableness or its value, fully and fairly, it cannot be that the law is so much at variance with common sense as to uphold it."

*Clark v. Lopez*, 75 Miss. 932, 933, 23 So. 648, 649 (1898), *quoting Allore v. Jewell*, 94 U.S. 506, 508–512, 24 L.Ed. 260 (1877). *See also Puryear v. Austin*, 205 Miss. 590, 39 So.2d 257 (1949). A person seeking to set aside an instrument on the ground of extreme mental weakness bears the burden of proving the existence of both the mental weakness and the inadequacy of the consideration by a preponderance of the evidence. *Humes v. Krauss*, 221 Miss. 301, 72 So.2d 737 (1954).

■ Inadequacy of consideration is alone insufficient to set aside a conveyance. Thus, this court must first consider the plaintiff's mental weakness before it may inquire as to the adequacy of consideration. *Pipes v. Webb*, 236 Miss. 612, 111 So.2d 641 (1959).

■ The evidence in this case clearly demonstrates that Dr. York was suffering from a major episode of depression in the summer of 1972. The testimony of Dr. York, however, establishes that he had been suffering from episodes of depression ever since his childhood. Despite this depression, Dr. York had been able to acquire approximately 10,000 acres of land. In addition, he bought, sold, and leased numerous acres of land from 1941 through the present. Plaintiffs have not claimed that Dr. York made any other "bad deals" over the last forty years due to his depression, other than this one. In fact, no similar claim has been made as to Dr. York's 1974

gift of 8,000 acres to Mississippi College nor to his subsequent business dealings with his nephew, Dr. Bennett York. All of the testimony before the court established that Dr. York was considered a competent businessman with a shrewd business mind.

Plaintiffs cite *Nohra v. Evans*, 509 S.W.2d 648 (Tex.Civ.App.1974), in support of their argument that the expert testimony in this action supports a finding of mental weakness. In *Nohra*, the plaintiff was described by experts as suffering from

> ... recurring periods of depression during which her ability to reason, relate, and focus on problems and reach decisions [was] significantly impaired. During these periods of depression, plaintiff lack[ed] the ability to understand and appreciate the nature and consequences of her actions as well as the ability to exercise her will in relation to her actions.

509 S.W.2d at 650. In the action *sub judice*, however, none of plaintiffs' experts, Dr. Williams or Dr. Simon, could testify that Dr. York's depression affected his business judgment during the negotiation or execution of the lease. In fact, Dr. Williams testified that Dr. York discussed the lease during their meetings and had he felt that Dr. York was not able to handle such a transaction, he would have so advised him. Moreover, Mr. Henry Lackey testified that although he had no independent recollection of the meeting at his office, had he thought Dr. York lacked the mental capacity to execute the instrument, he would never have let Dr. York sign it.

Finally, none of the traditional factors, as stated in the *Clark, Puryear,* and *Allore* cases, can be found in this case entitling Dr. York to set aside this Lease and Timber Sale Agreement. Dr. York proposed the terms of and initiated the transaction and he cannot, therefore, be said to have misunderstood the type of instrument he was entering into, nor can he assert that he did not understand the terms of that agreement. Thus, the court finds that the plaintiffs have wholly failed in their burden of establishing that Dr. York suffered from

great mental weakness at the time of the execution of the Lease and Timber Sale Agreement. The evidence clearly established that Dr. York possessed the mentality sufficient to enable him to understand and appreciate the nature and effect of the transaction.

Coupled with plaintiffs' allegations of great mental weakness is the issue of adequacy of consideration. Additionally, plaintiffs have asserted an alternate ground for setting aside the Lease and Timber Sale Agreement, that being unconscionability. Inherent in both of these grounds for rescission is the issue of whether the consideration received by Dr. York was adequate.

■ It is well settled that:

Mississippi adheres to the generally recognized rule that a consideration, while essential to the formation of a valid agreement, need not be adequate to be sufficient in law, and that sufficient consideration for a promise exists if there be any benefit to the Promisor or a detriment to the Promisee. Otherwise stated, the consideration for a promise is generally held to be sufficient where it is something of real value in the eyes of the law; and if it is so regarded, its adequacy is ordinarily immaterial, as its pecuniary or economic value. (Footnote omitted.)

.    .    .    .    .

"The legal sufficiency of a consideration for a promise does not depend upon the comparative economic value of the consideration and of what is promised in return." (Footnote omitted.)

*Dabbs v. International Minerals and Chemical Corporation*, 339 F.Supp. 654, 664 (N.D.Miss.1972). From a review of the evidence, the court finds that the consideration received by the Yorks was clearly adequate.

■ The Mississippi Supreme Court has held that an unconscionable contract is one "such as no man in his senses, and not under delusion, would make on the one hand, and as no honest and fair man would accept on the other." *Terre Haute Coo-*

*perage v. Branscome*, 203 Miss. 493, 35 So.2d 537, 541 (1948). There are two types of unconscionability, procedural and substantive. To demonstrate procedural unconscionability, the plaintiff must establish a lack of knowledge, lack of voluntariness, inconspicuous print, the use of complex legalistic language, disparity in sophistication or bargaining power of the parties and/or a lack of opportunity to study the contract and inquire about the contract terms. This type of unconscionability is most strongly shown in contracts of adhesion presented to a party on a "take it or leave it basis." *Bank of Indiana v. Holyfield*, 476 F.Supp. 104 (S.D.Miss.1979). Clearly, this type of unconscionability has not been shown in the action *sub judice*. Dr. York was a skilled businessman of many years. Additionally, it was he who prepared the terms of the lease proposal.

■ Substantive unconscionability is found (a) in contracts, the terms of which are of such an oppressive character as to be unconscionable or (b) where there exists a large disparity between the cost of an item and the price paid for it. *Holyfield*, 476 F.Supp. at 110. In the action *sub judice*, plaintiffs are asserting that the Lease and Timber Sale Agreement is unconscionable due to lack of consideration. This would appear to fall within the realm of substantive unconscionability.

■ The test of unconscionability is whether, in light of the commercial background and commercial needs of the particular trade or case, the clause or contract is so one-sided that it is unconscionable under the circumstances existing at the time the contract was made. *FMC Finance Corporation v. Murphee*, 632 F.2d 413, 420 (5th Cir.1980). The adequacy of the consideration given for the contract must be determined as of the date of the contract. *Hunt v. Davis*, 208 Miss. 710, 45 So.2d 350 (Miss. 1950). Furthermore, a contract found to be merely improvident will supply no basis for relief.

■ The paramount issue for review by this court under the allegations of the com-

plaint is the adequacy of consideration on the date of the execution of the Lease and Timber Sale Agreement. A full review of the proof offered in this action establishes beyond a doubt that the Yorks received adequate consideration for the lease. The only question remaining is whether the Yorks were compensated for the value of the standing timber.

▉ In 1972, Dr. York represented to the Internal Revenue Service that he received $557,851.00 for the standing timber. Dr. York now contends, however, that he did not receive payment for the standing product and that in 1972 the standing timber was worth $831,813.00. This court must hold that Dr. York is now estopped to assert anything contrary to his sworn representations to the Internal Revenue Service.

Dr. York's representation of the value to the Internal Revenue Service tends to discredit the testimony of plaintiffs' experts, Dr. Beckett and Don Bell, who valued the timber at, or based their calculations on a timber value of, $831,813.00. Moreover, Dr. York's estimate of the value of the timber lends credibility to the testimony of Georgia-Pacific's witnesses. The court finds that the Yorks were paid for the standing timber. This payment was in the form of a $5,000.00 front-end payment together with a $2.00 increase in the per acre per year rental and a removal of the $10.00 cap on the Wholesale Price Index rental increase.

The Yorks have received $841,706.23 in rental payments under the lease through January of 1984. The 1983 payment was based on $11.57 per acre per year. The court notes that this per acre rental is in excess of the usual $10.00 limit. In addition, defendant's expert, Dr. Straka, demonstrated by use of a chart that rental payments at the end of the final year of the lease may well be near $1,000,000.00.

Another factor figures prominently in the benefits derived by the Yorks from the Lease and Timber Sale Agreement. This is the tax advantage obtained by Dr. York by payment for the standing timber over a ten-year period, rather than a front-end payment. Dr. York's tax liability was greatly decreased by this method of payment for the standing timber. The testimony and exhibits clearly establish that Dr. York was very concerned with the tax ramifications of his business transactions. The court finds, therefore, that such tax considerations were something of real value to Dr. York, and to Mrs. York, and thus in the eyes of the law. This consideration, although not reflected in the lease agreement, was clearly a pecuniary gain to Dr. and Mrs. York. *Dabbs v. International Minerals and Chemical Corporation, supra, In re Sadlers Estate*, 232 Miss. 349, 98 So.2d 863 (1957).

This court, therefore, finds and holds that the consideration given by Georgia-Pacific to the Yorks for the standing timber was wholly adequate. Therefore, plaintiffs' assertions that the lease agreement should be set aside due to a greatly weakened condition, coupled with inadequate consideration, and on the basis of unconscionability are wholly unsupported by the evidence. Plaintiffs are not, therefore, entitled to any relief against this defendant.

This court having found the consideration given for the Lease and Timber Sale Agreement to be wholly adequate and, therefore, not unconscionable or executed under a veil of undue influence, finds it is not necessary to discuss Georgia-Pacific's affirmative defenses.[4] The court feels, however, that a discussion of one of these defenses could prove beneficial.

Although this court has reached a decision on the merits of this case in favor of Georgia-Pacific, had there been a contrary finding, the Yorks' actions would nevertheless have been barred by the doctrine of ratification.

---

4. It is evident that in the absence of mental incapacity, this action, commenced ten years after the execution of the Lease and Timber Sale Agreement, is barred by Mississippi's six-year statute of limitations. *Miss.Code Ann.* § 15–1–49 (1972).

**1280**

The testimony is uncontradicted in this case that throughout the term of the lease, the Yorks continued to accept all rental payments generated under the lease and have committed no act inconsistent with the validity of the Lease and Timber Sale Agreement. Georgia-Pacific asserts that, having so acted for over ten years, the Yorks are estopped by the doctrine of ratification from now contesting its validity. In response to this, the plaintiffs have asserted that while the Yorks may have ratified the lease agreement in regard to the per acre rental payments, their acceptance of the rental payments in no way ratified the separate contract for the sale of timber.

### A. *Is the Lease and Timber Sale Agreement Severable?*

It is well settled in Mississippi that a contract will be deemed divisible in only the most obvious of cases. *Hamilton v. McGill*, 352 So.2d 825 (Miss.1977). The test to be applied to determine whether a contract is severable or divisible is:

> Whether a contract is entire or divisible cannot be determined by a single term, phrase or sentence, though the same be large enough to include such meaning, unless throughout the whole agreement, the surrounding circumstances and good sense and justice of the case, it definitely appears that it was the intention of the parties to the contract that it should be entire and indivisible.

*Ganong & Chenoweth v. Brown*, 40 So. 556, 557 (Miss.1906). *See also Clark v. Till*, 177 Miss. 891, 172 So. 133 (Miss.1937).

The court in *Clark, supra,* expanded its explanation of the test to be applied to determine severability stating that "[i]f it was a divisible contract in part, and an independent one in another part, the contractor, when one part was completed could recover therefor although he refused to carry out his contract as to the other parts." *Clark*, 172 So. at 135.

It is apparent to this court that the Lease and Timber Sale Agreement in the action *sub judice* was clearly intended to

be an entire and indivisible contract. As we have previously held, the consideration for the standing timber is embodied in the terms of the lease. It takes the form of a $5,000.00 front-end payment together with a $2.00 per acre increase in the rental value and the removal of the $10.00 limit on the rental increase commensurate with the Wholesale Price Index. These terms are so intertwined with the rental payments that severance is not possible. Accordingly, the plaintiffs' first argument against the application of the doctrine of ratification must fail.

### B. *Knowledge.*

It is well established that a suit can only be barred by the defense of ratification when the plaintiff continues to act consistent with the contractual agreement with knowledge of the essential facts entitling him to rescind the contract. *Guice v. Burrage*, 156 F.2d 304 (5th Cir.1946); *Crabb v. Wilkinson*, 202 Miss. 274, 32 So.2d 356 (1947); *Koenig v. Calcote*, 199 Miss. 435, 25 So.2d 763 (1946). Plaintiffs assert that Dr. and Mrs. York had no knowledge that Georgia-Pacific failed to pay them for the standing timber until 1980 when Dr. York was informed of Bennett York's conversation with Mr. Kennedy. Plaintiffs' argument must fail.

First, the Yorks' contention, especially that of Dr. York, that they had no knowledge of Georgia-Pacific's failure to pay them front-end money on the lease agreement in 1972 is discredited by the fact that Dr. York had, just two years prior, negotiated with International Paper Company in regard to a lease which was to include a $450,000.00 front-end payment. Additionally, Dr. York corresponded with Georgia-Pacific in 1972 to express his doubts as to the providence of the lease and the effects of the Wholesale Price Index upon his rental payments. Furthermore, the deeds to Mississippi College recited the terms of the Lease and Timber Sale Agreement in detail, indicating that Dr. York fully reviewed

and understood the terms of that agreement.[5]

Second, even assuming that Dr. York first became aware that he and his wife had not been paid a front-end payment until 1980, they continued to accept rental payments under the lease agreement and acted in every manner consistent with that agreement until 1981, when Dr. York registered his complaint in a letter to Georgia-Pacific. In fact, the Yorks have continued to accept rental payments through the date of the trial of this cause. Any argument by the Yorks that they continued to accept rental payments only as a ratification of the lease portion of the agreement must fail. A similar situation was presented to the Mississippi Supreme Court in *Crabb v. Wilkinson*, 202 Miss. 274, 32 So.2d 356 (1947). There, the court stated:

> Appellees urge, however, that by their stated conduct they did not intend to affirm the mineral deed here sought to be cancelled, but intended to affirm only the Lease, and that they had no thought of giving recognition to the mineral deed. They so testified. No authority is cited by Appellees in support of that argument. We call attention to the closing sentence of the quotation taken from *Koenig v. Calcote*, (199 Miss. 435, 25 So.2d 763, 767), as respects "conduct inconsistent with an intention of avoiding" the contract. The conduct is looked to in such cases to find the intention, otherwise, the rule as stated would become in practical effect, no rule at all.

*Crabb*, 32 So.2d at 358.

Thus, the Yorks by virtue of their conduct, inconsistent with an intention to avoid the contract, are barred from bringing this suit by virtue of the doctrine of ratification.

### Conclusion

This court is of the opinion that Georgia-Pacific should prevail on the merits of this case. The plaintiffs have failed to prove that they are entitled to have the Lease and Timber Sale Agreement set aside. Moreover, even had this court found that plaintiffs should prevail on the merits, their cause of action is barred by the equitable doctrine of ratification.

A judgment in conformity with this opinion shall issue.

---

5. Dr. York testified that he handled all of the business transactions for his wife and himself.

This was corroborated by the testimony of Mrs. York.