# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 97-CA-00481-SCT

*ENTERGY MISSISSIPPI, INC., FORMERLY*
*MISSISSIPPI POWER & LIGHT COMPANY*

*v.*

*BURDETTE GIN COMPANY*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/24/97 |
| TRIAL JUDGE: | HON. GRAY EVANS |
| COURT FROM WHICH APPEALED: | WASHINGTON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JOHN H. DUNBAR |
| ATTORNEY FOR APPELLEE: | PAUL V. OTT |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED - 08/06/98 |
| MOTION FOR REHEARING FILED: | 8/21/98 |
| MANDATE ISSUED: | 10/15/98 |

**BEFORE SULLIVAN, P.J., ROBERTS AND WALLER, JJ.**

**SULLIVAN, PRESIDING JUSTICE, FOR THE COURT:**

¶1. On July 5, 1988, Percy Harper, Perry Butler, and Stanley Poe were re-painting a seed house for their employer, Burdette Gin Co. The workers used a scaffold to paint the seed house, and the scaffold came into contact with uninsulated overhead power lines constructed and maintained by Entergy Mississippi, Inc. (then Mississippi Power & Light Co.). Harper and Butler brought suit against Entergy in the Washington County Circuit Court for the injuries they sustained from electrical shock caused by the contact between the scaffold and the power lines.

¶2. Entergy provided electrical service to Burdette Gin pursuant to an Agreement for Service originally signed by Burdette Gin's President, Rex A. Morgan, on August 23, 1971. The Agreement for Service includes an indemnity clause which reads:

> Customer takes notice of the "8-Foot Statute" (Section 7015-11 to 7015-19, inclusive, Mississippi Code of 1942, as amended) making it unlawful to erect, operate, install or store any equipment, materials or other things within 8 feet of a high voltage overhead line, and covenants that he will not violate said statute nor permit such violation by any person under his control with respect to the Company's lines on or adjacent to Customer's premises. Should Customer violate this provision, or any other applicable provision of law as to safety around

electric power lines, then Customer will defend, indemnify and save harmless the Company from and against any and all claims and expense on account of injury or damage to any person or property resulting from such violation.

The Mississippi Public Service Commission (MPSC) first approved the revision to Entergy's Agreement for Service including the indemnity clause in a February 2, 1971, order. The MPSC approved subsequent changes to Entergy's service agreement containing the same indemnity clause on December 18, 1972, December 11, 1973, January 24, 1978, and November 30, 1990. Although proper notice was given, no objections to any of Entergy's petitions were filed with the MPSC regarding the indemnity clause.

¶3. Entergy filed a third party claim and first amended third party claim on November 9, 1992, and July 8, 1993, respectively, against Burdette Gin, seeking to enforce the indemnity provision in the Agreement for Service. Burdette Gin filed its answers to the third party claim and amended third party claim on December 31, 1992, and July 19, 1993, respectively, asserting among other affirmative defenses that the indemnity clause was unconscionable and void as a matter of public policy, and therefore unenforceable. Burdette Gin also filed a motion for summary judgment on July 19, 1993, requesting that the circuit court dismiss the third party claim, because the contract was unconscionable and void as a matter of public policy. On August 10, 1993, Entergy filed a response to Burdette Gin's summary judgment motion and a cross-motion for partial summary judgment on the issue of the enforceability of the indemnity clause. Entergy asserted that the clause was neither unconscionable nor contrary to public policy, and merely reasonably obliged Burdette Gin to do what it was already required to do under Mississippi law.

¶4. On August 12, 1994, Circuit Court Judge Gray Evans granted Burdette Gin's motion for summary judgment and denied Entergy's cross-motion for partial summary judgment, thereby dismissing Burdette Gin from the cause with prejudice. Judge Evans entered final judgment in the case on March 24, 1997, approving a settlement between Entergy and Harper and Butler, and ordering that Entergy take nothing from Burdette Gin on its third party claim due to the summary judgment award. Entergy filed its notice of appeal to this Court on April 9, 1997, and assigns as error the circuit court's assertion of jurisdiction over this matter, and the court's award of summary judgment based upon its findings that the indemnity clause was unconscionable and void as a matter of public policy.

## STATEMENT OF THE LAW

### Standard of Review

¶5. Whether the circuit court had proper jurisdiction to hear a particular matter is a question of law, and this Court must therefore apply a de novo standard of review to this issue. *Wright v. White*, 693 So.2d 898, 900 (Miss. 1997). "This Court applies a de novo standard of review to a grant of summary judgment by the lower court. The evidence must be viewed in the light most favorable to the party against whom the motion has been made." *Russell v. Orr*, 700 So.2d 619, 622 (Miss. 1997).

**I.**

**THE CIRCUIT COURT DID NOT HAVE JURISDICTION TO HEAR THE ATTACK ON THE INDEMNITY AGREEMENT APPROVED BY THE MISSISSIPPI PUBLIC SERVICE COMMISSION**.

¶6. Although not addressed by either party, the circuit court had pendent jurisdiction to hear this matter. "A claim is pendent if it 'arise[s] out of the same transaction or occurrence as the principal claim or, as others put it, out of a common nucleus of operative fact.'" *McDonald's Corp. v. Robinson Indus., Inc.*, 592 So.2d 927, 934 (Miss. 1991) (*quoting Hall v. Corbin*, 478 So.2d 253, 255 (Miss.1985)). "[W]here a circuit court has jurisdiction of an action at law, it may hear and adjudicate in that action all claims, including those with an equitable smell, arising out of the same transaction and occurrence as the principal claim." *Hall*, 478 So.2d at 255. It is undisputed that the Washington County Circuit had proper subject matter jurisdiction over the original personal injury claims in this case. Based upon the theory of pendent jurisdiction, therefore, the circuit court also had proper jurisdiction over the claims of unconscionability and void as a matter of public policy raised by Burdette Gin, because they arose out of the same transaction.

## II.

**THE LOWER COURT ERRED IN HOLDING THE INDEMNITY AGREEMENT IN VIOLATION OF PUBLIC POLICY.**

¶7. Entergy contends that MPSC approval for inclusion of the indemnity clause in its Agreement for Service is sufficient to remove the contract from the definition of void as a matter of public policy. Under Section 77-3-2, the Mississippi Legislature created the MPSC in order to protect the public policy of Mississippi regarding the regulation of public utilities. Miss. Code Ann. § 77-3-2 (1991). The MPSC "acts on behalf of the public in regulating utilities." *South Cent. Bell v. Epps*, 509 So.2d 886, 891 (Miss. 1987). "[C]ertain administrative rules have the force of law." *Tucker v. Hinds County*, 558 So.2d 869, 875 (Miss. 1990). This Court will not interfere with the rule-making power of an administrative agency, such as the MPSC, unless that agency exceeds the power granted to it by the legislature. *Mississippi Pub. Serv. Comm'n v. Mississippi Power & Light Co.*, 593 So.2d 997, 1000 (Miss. 1991). Entergy's position is that the circuit court's holding is the same as finding state law contrary to public policy. It asserts that the courts of this state should not interfere with the MPSC's power to that extent. The problem with this argument is that in approving Entergy's service agreement, the MPSC was not exercising its rule or public policy-making power.

¶8. However, even if the MPSC's order approving Entergy's contract language could be called a rule, we find that the MPSC exceeded its authority by approving the indemnity clause, because it violated Mississippi law regarding Entergy's responsibility in protecting the general public. Upholding the indemnity agreement could place the public in danger by allowing Entergy to escape liability for its own negligence in maintaining its power lines.

> The degree of diligence which a distributor of electricity must observe in the distribution of the dangerous agency of electricity is a very high degree of care. When human life is at stake due care under the prevailing circumstances requires that everything that gives reasonable promise of preserving life must be done regardless of difficulty or expense. Moreover, the degree of care increases as the danger increases.

*Mississippi Power & Light Co. v. Shepard*, 285 So.2d 725, 729 (Miss. 1973). We have previously held that violation of the eight-foot rule, now codified in Miss. Code Ann. § 45-15-1 et seq. and extended to ten feet, does not insulate the utility from liability for its own negligence in maintaining its electrical lines. *White v. Mississippi Power & Light Co.*, 196 So.2d 343, 350 (Miss. 1967); *Mississippi Power & Light Co. v. Walters*, 248 Miss. 206, 252-56, 158 So.2d 2, 20-22 (1963). Specifically, we have stated:

> The statute in our opinion does not change the rule that persons operating electrical systems transmitting deadly currents of electricity are required to exercise the highest degree of care in their construction and maintenance. The statute in our opinion was not enacted for the purpose of relieving the Power Company from its duty to exercise due care to place its high-tension wires a sufficient distance above the ground to guard against contact of any nature directly or indirectly that might ordinarily be anticipated. The precautionary measures prescribed in the act are prescribed especially for the protection of workmen who, in the performance of lawful work on premises occupied by high-tension wires, may be exposed to the dangers incident to the performance of the work assigned to them.

*Mississippi Power & Light Co. v. Walters*, 248 Miss. 206, 254, 158 So.2d 2, 21 (1963). "It is the general rule that a public utility or common carrier cannot contract against liability for his own negligence, and it may not be doubted that such a tort feasor may not recover under an indemnity agreement which impinges upon this rule." *Illinois Cent. R.R. v. Standard Oil Co.*, 292 F. Supp. 337, 339-40 (S.D. Miss. 1968). We hold that an indemnity clause in a utility service contract such as the one at issue here intrudes upon the public policy of this State requiring utilities to "exercise the highest degree of care" in constructing and maintaining electrical lines. We cannot allow a utility to contract away its well-established duty of protecting the general public.

¶9. Entergy points to Mississippi cases in which the courts have upheld broader indemnity clauses in public utility contracts. *Lorenzen v. South Cent. Bell Tel. Co.*, 546 F. Supp. 694 (S.D. Miss. 1982); *Mississippi Power Co. v. Roubicek*, 462 F.2d 412 (5th Cir. 1972); *Heritage Cablevision v. New Albany Elec. Power Sys.*, 646 So.2d 1305 (Miss. 1994). However, these cases are all distinguishable from the current case, because they involved contracts between the utility and non-customers, and therefore revolved around the negotiation of two private concerns, unaffected by the greater public policy consideration here.

¶10. Release from negligence contracts between public service companies and their customers have traditionally been held void as a matter of public policy "(1) to discourage negligence by making wrongdoers pay damages, and (2) to protect those in need of goods or services from being overreached by others who have power to drive hard bargains." *[Bisso v. Inland Waterways Corp., 349 U.S. 85, 90-91 (1955)](#)*. Where, as here, the customer has only one choice for an electrical provider, the danger of the utility overreaching through inclusion of an indemnity clause is increased. Other jurisdictions have therefore found such indemnity clauses to be void as a matter of public policy. *Beachboard v. Southern Ry. Co.*, 193 S.E.2d 577, 583 (N.C. Ct. App. 1972); *Helmick v. Potomac Edison Co.*, 406 S.E.2d 700, 707 (W.Va. 1991); *Richardson-Wayland Elec. Corp. v. Virginia Elec. & Power Co.*, 247 S.E.2d 465, 466-68 (Va. 1978). In contracts between the utility and its customers, where the utility's public duty to exercise a very high degree of care is invoked, we hold that indemnity provisions protecting the utility from its own negligence are void as a matter of

public policy.

## III.

## THE LOWER COURT ERRED IN HOLDING THE INDEMNITY AGREEMENT UNCONSCIONABLE.

¶11. Entergy claims that the rules of unconscionability do not apply to a regulated contract such as the one in this case, but only to private arm's-length transactions in which one party might overreach. Alternatively, Entergy contends that there is no evidence of unconscionability in this case. Burdette Gin, on the other hand, maintains that the MPSC failed to adequately safeguard the public when it approved Entergy's service agreement language, and the circuit court was therefore correct in finding the indemnity clause unconscionable.

> Unconscionability has been defined as "an absence of meaningful choice on the part of one of the parties, together with contract terms which are unreasonably favorable to the other party." To show that a provision is conscionable, the party seeking to uphold the provision must show that the provision bears some reasonable relationship to the risks and needs of the business.

*Bank of Indiana, Nat'l Ass'n v. Holyfield*, 476 F. Supp. 104, 109 (S.D. Miss. 1979) (citations omitted). "In *Terre Haute Cooperage, Inc. v. Branscome*, 203 Miss. 493, 35 So.2d 537 (1948), this Court defined an unconscionable contract as '. . .one such as no man in his senses and not under a delusion would make on the one hand, and as no honest and fair man would accept on the other. . . .'" *In re Will of Johnson*, 351 So.2d 1339, 1341 (Miss. 1977).

¶12. Here, Burdette Gin claims that the indemnity clause was procedurally unconscionable.

> The indicators of procedural unconscionability generally fall into two areas: (1) lack of knowledge, and (2) lack of voluntariness. A lack of knowledge is demonstrated by a lack of understanding of the contract terms arising from inconspicuous print or the use of complex, legalistic language, disparity in sophistication of parties, and lack of opportunity to study the contract and inquire about contract terms. A lack of voluntariness is demonstrated in contracts of adhesion when there is a great imbalance in the parties' relative bargaining power, the stronger party's terms are unnegotiable, and the weaker party is prevented by market factors, timing or other pressures from being able to contract with another party on more favorable terms or to refrain from contracting at all.

*Holyfield*, 476 F. Supp. at 109-10 (citations omitted).

### A. Lack of Knowledge

¶13. Entergy maintains that Burdette Gin failed to meet its burden of proof on the issue of unconscionability, because the evidence revealed that Burdette Gin's manager was a skilled businessman and signed the contract voluntarily. It points to *York v. Georgia-Pacific Corp.*, 585 F.Supp. 1265 (N.D. Miss. 1984), to support its theory that procedural unconscionability cannot be shown where the complaining party is a "skilled businessman of many years." *York*, 585 F.Supp. at 1278. However, in *York*, as in other cases analyzing procedural unconscionability, the relative sophistication of the parties was only one factor considered by the court. Additionally, the facts in

*York* are clearly distinguishable from this case, because the complaining party in *York* prepared the contract terms himself. *Id*.

¶14. Burdette Gin maintains that its president, Rex A. Morgan, who originally signed the service agreement, although a businessman, was a farmer by trade and no match for Entergy's team of attorneys. There is little to no evidence in the record before this Court regarding the comparative business savvy of the contracting parties here. However, it is reasonable to assume that a large company such as Entergy holds the advantage in that respect. Contrary to Burdette Gin's assertion, the language in the indemnity clause is fairly straight-forward, not misleading or complex. However, based upon the legal resources available to Entergy as compared to most of its customers, we find that the factor of "lack of knowledge" weighs in favor of Burdette Gin in this case.

### B. Lack of Voluntariness

¶15. The voluntariness factor alone is enough to find the indemnity clause unconscionable in this case. Burdette Gin was unable to contract with another party since Entergy was the sole supplier of electricity in the area. Although Burdette Gin did not assert that it attempted to negotiate the terms of its service agreement with Entergy, evidence presented to the circuit court revealed that Entergy *never* negotiates the terms of its service agreement. Only one customer was ever allowed to negotiate the terms of the service agreement, and that was in a very large manufacturing contract. Based upon these facts, we hold that the indemnity clause was procedurally unconscionable and therefore unenforceable. Procedural unconscionability "is most strongly shown in contracts of adhesion presented to a party on a 'take it or leave it basis.'" *York*, 585 F.Supp. at 1278 (*quoting **Holyfield***, 476 F.Supp. at 108). We find that where, as here, the contract is essentially a contract of adhesion, any indemnity clause is presumed unconscionable.

¶16. To refute Burdette Gin's proof that the indemnity clause is unconscionable, Entergy must show that the provision was reasonably related to the business risks of the parties. ***Holyfield***, 476 F. Supp. at 109. Entergy asserts that the indemnity clause was reasonably related to the business risks assumed by the parties in avoiding personal injury. It asserts that the indemnity clause only reasonably required Burdette Gin what it was already legally required to do under the eight foot statute. However, as previously discussed, the purpose of the eight foot statute is to protect workers from injury, not to allow Entergy to shield itself from liability from its own potential negligence. Since it is possible that both the employer and the utility could be jointly liable in an accident such as the one at issue in this case, it is not reasonable to allow Entergy, with its significantly greater bargaining power, to essentially unilaterally impose the indemnity clause upon its customers such as Burdette Gin.

### <u>CONCLUSION</u>

¶17. The Washington County Circuit Court had proper subject matter jurisdiction to decide the issues of unconscionability and public policy in this case based upon pendent jurisdiction and the pleading requirements in the Mississippi Rules of Civil Procedure. Public policy in Mississippi requires utilities to exercise a very high degree of care in protecting the public from the dangers of electricity. The trial court correctly found that the indemnity clause at issue here was void as a matter of public policy, because it unnecessarily shielded Entergy from its own potential negligence in constructing and maintaining its electrical lines. The indemnity clause is also procedurally unconscionable, because Entergy's monopolistic position and general refusal to negotiate the terms of its service agreement

denied Burdette Gin voluntariness in signing the agreement.

¶18. The undisputed material facts in this case supported the circuit court's award of summary judgment in favor of Burdette Gin. As a result, we affirm the lower court's decision.

¶19. **AFFIRMED**.

**PRATHER, C.J., PITTMAN, P.J., McRAE, ROBERTS AND WALLER, JJ., CONCUR. MILLS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY BANKS AND SMITH, JJ.**

**MILLS, JUSTICE, DISSENTING:**

¶20. I respectfully dissent from the majority.

¶21. The majority opinion might be strengthened by consideration of certain basic facts not found in that narrative.

¶22. The original plaintiffs, Harper and Butler, were painting seed bins for their employer, Burdette Gin Company, on July 5, 1988. They were standing on a 25 foot tall metal scaffold. The power lines in question, which ran along the edge of an adjacent road, were over 24 feet above ground and at least 19 feet from the seed bins. As the painters worked, they pushed the scaffold within eight feet of the power lines, and ultimately tilted the scaffold into the overhead power lines.

¶23. Our pronouncements of public policy should encourage appropriate behavior by all actors in private and commercial society. Should Entergy, as a matter of public policy, be disallowed from contracting with a commercial customer for protection from liability from lawsuits where the customer possesses superior ability to protect the health and safety of persons located on the premises? To answer this question, I must first ask who was most capable of preventing the accident in question. The first parties who could have prevented this action, of course, were the workers, Harper and Butler, who erected a 25 foot metal scaffold underneath a power line located 24 feet above ground, and who then tilted the scaffold into the power line. Did the indemnity agreement discourage or hamper their actions?

¶24. The next actors most capable of preventing this accident would have been the principals of Burdette Gin Company. The local managing officers of the company were aware of the actions of their working men and were quite capable of taking action to prevent this accident. Finally, Entergy could have prevented this accident by failing or refusing to provide electrical service to Burdette Gin Company.

¶25. I first disagree that this Court should institute its own interpretation of public policy under the facts of this case. The Mississippi Legislature has directly granted broad powers to the Mississippi Public Service Commission for the purpose of determining the public policy of the State of Mississippi in regards to the actions of public utilities. See Mississippi Code of 1972 § 77-3-2 (as amended). We should hesitate to insert our own public policy views in cases such as the one before us. *Mississippi Pub. Serv. Comm'n v. Mississippi Power & Light Co.*, 593 So. 2d 997(Miss.1991).

¶26. I also would find that the indemnity clause entered into between Burdette Gin Company and Entergy was sound as a matter of public policy. Mississippi law allows providers of electricity to enter into "Service Policies" approved by the Public Service Commission. The service policy in effect in this case stated as follows:

> This Service Policy is designed to govern the supplying and taking of electric service in such a manner as will secure to each Customer the greatest practicable latitude in the enjoyment of this service consistent with good service to himself and other Customers, and with safety to Customers and Company. The supplying of service by Company and the taking of service by Customer shall in all respects be subject to the orders of the Mississippi Public Service Commission or any other Governmental authority asserting jurisdiction.

¶27. By regulation, providers may require commercial and industrial customers to sign an "Agreement for Service" which defines the terms and conditions of electrical service to that customer. The "Agreement for Service" in question was entered into between Entergy and Burdette Gin Company on August 23, 1971 and provides as follows:

> Customer [Burdette Gin] takes notice of the "8-Foot Statute" (Section 7015-11 to 7015-19, inclusive, Mississippi Code of 1942, as amended)making it unlawful to erect, operate, install or store any equipment, materials or other things within 8 feet of a high voltage overhead line, and covenants that he will not violate said statute nor permit such violation by any person under his control with respect to the Company's lines on or adjacent to Customer's premises. Should Customer violate this provision, or any other applicable provision of law as to safety around electric power lines, then Customer will defend, indemnify and save harmless the Company from and against any and all claims and expense on account of injury or damage to any person or property resulting from such violation.

¶28. The above quoted language does not grant immunity to Entergy. It does encourage the actors most capable of preventing harm, i.e. the gin managers and its employees, to act with prudence and caution. Such public policy encourages those persons most capable of acting to assume primary responsibility for accidents such as we have here. In this case, Entergy did all within its power to alert Burdette Gin Company of the danger of constructing obstacles near the power lines. Burdette Gin Company acknowledged the notice given it and entered into the agreement for mutual benefit between two commercial entities, agreeing to indemnify Entergy for any damages which might occur as a result of Burdette's violation of the power line statute.

¶29. I would hold Burdette to its agreement and continue the rule of law allowing such indemnity agreements as most recently set out in the analogous case of ***Heritage Cablevision v. New Albany Electric Power System***, 646 So.2d 1305 (Miss.1994).

**BANKS AND SMITH, JJ., JOIN THIS OPINION.**