# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2002-IA-00858-SCT

*JOHN H. WARE, INDIVIDUALLY, AND ON BEHALF
OF OTHERS*

*v.*

*ENTERGY MISSISSIPPI, INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/20/2002 |
| TRIAL JUDGE: | HON. LILLIE BLACKMON SANDERS |
| COURT FROM WHICH APPEALED: | ADAMS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JOHN E. MULHEARN, JR. |
| | BRYAN HOWARD CALLAWAY |
| ATTORNEYS FOR APPELLEE: | CHARLES EDWIN ROSS |
| | NATIE P. CARAWAY |
| | WILLIAM B. LOVETT |
| | JAMES W. SNIDER, JR. |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | AFFIRMED IN PART; REVERSED IN PART; AND REMANDED - 12/31/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1. This wrongful death electrocution case comes to us via an interlocutory appeal which was granted by order of this Court on petition of John H. Ware (Ware), individually and on behalf of others. The trial court was presented with several motions in limine. We granted Ware's M.R.A.P. 5 petition which was filed pursuant to the granting of two of those motions in limine in favor of Entergy Mississippi, Inc. by the Circuit Court of Adams County. As a

result of the granting of the first motion, the jury will be instructed to allocate fault to the immune employer of Ware's decedent even though it has been dismissed from the lawsuit. The granting of the second motion prevents the introduction of any testimony or evidence related to the question of whether Entergy should have, or could have, placed the high voltage power line underground. Ware asserts that intertwined with this second issue is the question of the admissibility of an Entergy internal memorandum which by reference would be included in the trial court's granting of the second motion in limine. We affirm the trial court's grant of the motion in limine related to the employer; however, we reverse and remand as to the trial court's grant of the motion in limine relating to presentation of evidence concerning the utility company's duty of care.

### FACTS AND PROCEEDINGS IN THE TRIAL COURT

¶2.    On February 7, 1997, Glinnis Marsaw was electrocuted while in the employ of Jack Dallas, Inc. (Dallas), an electrical contractor.    The pertinent facts leading up to this tragic event follow.

¶3.    Approximately one week prior to this fatal accident, a construction crew, while installing an underground telephone line, inadvertently severed an underground electrical line owned by the Mississippi Department of Transportation (MDOT). This MDOT-owned underground electrical line supplied electricity to MDOT-owned streetlights which lined U.S. Highway 84 leading to the Natchez-Vidalia bridge spanning the Mississippi River. This MDOT lighting system had been put in place prior to 1988. Entergy owned an overhead power line which had been installed in 1996, and this power line supplied electricity only to the streetlights located on the Mississippi River bridge. MDOT had approved the placement of the

2

Entergy power line, and Entergy followed the then-applicable provisions of the National Electrical Safety Code (NESC) in the placement and installation of the power line. The MDOT streetlight poles and underground line ran between Entergy's overhead line and U. S. Highway 84. The MDOT streetlight poles had lights mounted on fifteen-foot lever arms which extended out over Highway 84 in the direction opposite the location of the Entergy power line. There was a distance of approximately twenty ground feet between the MDOT streetlights/underground power line and the point on the ground directly underneath Entergy's overhead power line.

¶4.     Dallas had been hired by MDOT to repair its underground electrical wire damaged the previous week by the crew installing the underground telephone line. Entergy was unaware of the existence of the damaged MDOT power line and the presence of the Dallas crew on the scene to perform the repair work on the date of this accident. The Dallas crew commenced its work under rainy conditions. It was necessary to take down the MDOT streetlight poles to repair the MDOT underground power line and then "re-erect" the poles. Three Dallas crew members, including Marsaw, were re-erecting a light pole immediately prior to the accident. One crew member operated the boom truck arm, another crew member was holding a rope attached to the pole, and Marsaw was actually holding the base of the pole. As this three-member crew attempted to maneuver the light pole back into its proper upright position, the light pole came into contact with the energized overhead Entergy power line, causing the electrical current to pass from the Entergy line, through the MDOT pole, and through the chest, right hand and left foot of Marsaw, thus electrocuting him.

¶5. Plaintiff Ware, as wrongful death beneficiary of Marsaw, filed suit against Entergy, MDOT, Dallas, Deviney Construction, and BellSouth Telecommunications, Inc. The trial court granted summary judgment in favor of Dallas, under the exclusivity provision of the Mississippi Workers' Compensation Act, Miss. Code Ann. § 71-3-9. Entergy filed several motions in limine, two of which are before us today on this interlocutory appeal. In these two motions in limine, Entergy moved (1) to have the jury instructed to allocate fault to the immune employer even though it was dismissed from the lawsuit, and (2) to exclude any testimony or evidence related to whether Entergy should have, or could have, placed the high voltage power line underground. Both of those motions were granted by the trial court.

## STANDARD OF REVIEW

¶6. The standard of review regarding the admission or exclusion of evidence is abuse of discretion. ***Thompson Mach. Commerce Corp. v. Wallace***, 687 So.2d 149, 152 (Miss. 1997). The trial court does not abuse its discretion in granting a motion in limine if the court determines that (1) the material or evidence in question will be inadmissible at trial under the rules of evidence; and (2) the mere offer, reference, or statements made during trial concerning the material will tend to prejudice the jury. ***Whittley v. City of Meridian***, 530 So.2d 1341, 1344 (Miss. 1988) (adopting the test set forth by the Kansas Supreme Court in ***State v. Quick***, 226 Kan. 308, 311, 597 P.2d 1108 (1979)). For questions of law, this Court's standard of review is de novo. ***Saliba v. Saliba***, 753 So.2d 1095, 1098 (Miss. 2000).

## ANALYSIS

I. **IN VIEW OF THIS COURT'S OPINIONS IN *ACCU-FAB & CONSTRUCTION, INC. v. LADNER*, 778 So.2d 766 (Miss. 2001) AND *MACK TRUCKS, INC. v. TACKETT*, 841 So.2d 1107 (Miss.**

4

**2003), IS IT ERROR TO PROVIDE FOR THE JURY, ON THE FORM OF THE VERDICT, TO APPORTION OR ALLOCATE FAULT WITH RESPECT TO AN IMMUNE EMPLOYER?**

¶7.    As Ware concedes in his Reply Brief, the answer to this question was definitively answered in the negative by this Court's decision in *Mack Trucks, Inc. v. Tackett*, 841 So.2d 1107 (Miss. 2003) (*Mack Trucks II*).  In *Mack Trucks II*, we held: "[t]o the extent that *Accu-Fab*[1] may be construed as stating that immune parties may not be assessed fault (as opposed to liability) under § 85-5-7, therefore, that opinion is overruled."  841 So.2d at 1115 (¶ 28). The Legislature addressed this issue by a 2002 amendment to Miss. Code Ann. § 85-5-7 which states in its entirety:

> Except as provided in subsection (6) of this section, in any action involving joint tort-feasors, *the trier of fact shall determine the percentage of fault for each joint tort-feasor, including named parties and absent tort-feasors, without regard to whether the joint tort-feasor is immune from damages*. For noneconomic damages, a defendant's liability shall be several only. For economic damages, for any defendant whose fault is determined to be less than thirty percent (30%), liability shall be several only and for any defendant whose fault is determined to be thirty percent (30%) or more, liability shall be joint and several only to the extent necessary for the person suffering injury, death or loss to recover fifty percent (50%) of his recoverable damages. *Fault allocated under this subsection to an immune tort-feasor or a tort-feasor whose liability is limited by law shall not be reallocated to any other tort-feasor*.

Miss. Code Ann. § 85-5-7(8) (emphasis added).[2]   Although this amendment was not effective until January 1, 2003, after the incident involved in the case sub judice, we simply acknowledge its existence to assure the reader that the amended statute has not been overlooked.   However, this amended statute has not been applied to the case before us today, nor do we by mentioning

---

[1]*Accu-Fab & Constr., Inc. v. Ladner*, 778 So.2d 766 (Miss. 2001).

[2]The entire text of Miss. Code Ann. § 85-5-7(8) was adopted by the 2002 Legislature, in special session.  The prior subsection (8) now appears as § 85-5-7(9).

this amended statute in any way imply what position we may take when called upon in future cases to consider the appropriateness of its application.

¶8.     On the other hand, Ware is correct in his assertion that the resolution of this issue does not enlarge Entergy's rights on the allocation of fault under Miss. Code Ann. § 45-15-13(2), which provides:

> There is hereby created a right of action on behalf of any electric utility which is required to pay any sum for injury or death of any person resulting from contact with a high voltage overhead line against any person whose negligence is a proximate contributing cause of such injury or death for that portion of any non-agreed judgment for damages rendered against and paid by the electric utility and attributable to the negligence of such person, *however, the electric utility may not recover any portion of such sum which is attributable to its own negligence*. The right of action created hereby shall not be available against persons who comply with the provisions of this chapter, and violations of this chapter shall not be considered negligence per se but may be considered as evidence of negligence.

(emphasis added).   Inasmuch as this issue has already been decided in ***Mack Trucks (II)***, the trial court was correct in granting Entergy's motion in limine relative to the allocation of fault to the immune employer.

> **II.     DOES THE POLICY FOR THE EXTENSION OF UNDERGROUND ELECTRIC DISTRIBUTION FACILITIES SUBMITTED BY MISSISSIPPI POWER & LIGHT COMPANY (PREDECESSOR TO ENTERGY MISSISSIPPI, INC.) APPROVED BY THE MISSISSIPPI PUBLIC SERVICE COMMISSION ON AUGUST 14, 1996, PROHIBIT ENTERGY FROM INSTALLING UNDERGROUND DISTRIBUTION LINES?**

¶9.     The trial court entered an order prohibiting any testimony as to whether Entergy could have, or should have, placed the high voltage lines underground.   Entergy asserts that it was prohibited under the filed rate plan from placing the high voltage power lines underground unless the customer (City of Natchez) was willing to pay the expense for doing so.   By granting

6

Entergy's Fourth Motion in Limine (which is the second of two motions in limine we address today), the trial court excluded all testimony and evidence (1) that Entergy had the duty or authority to place the power line in question underground and (2) that utilities in other states put power lines underground.

¶10.    Plaintiff's Second Amended Complaint alleges inter alia that Entergy was negligent in the placement and maintenance of the high voltage power lines. Specifically, Ware asserts that the high voltage line was placed after the installation of the MDOT break-away light posts and was at a dangerously lower height. As already stated, the fatal accident occurred after a crew had taken the light post down, made repairs, and was putting the light post back in place. Ware asserts that Entergy should have, or could have, placed the high voltage line underground rather than overhead.

¶11.    Entergy asserts that, under Miss. Code Ann. § 77-3-35 and the Policy For The Extension of Underground Electric Distribution Facilities filed with the Public Service Commission (PSC), Entergy is not entitled to or authorized to place a power line underground unless the customer agrees to pay for such. Section 77-3-35 states, in part:

> No such public utility shall directly or indirectly, by any device whatsoever, or in anywise, charge, demand, collect or receive from any person or corporation for any service rendered or to be rendered by such public utility a greater or less compensation than that prescribed in the schedules of such public utility applicable thereto then filed in the manner provided in this section, and no person or corporation shall receive or accept any service from any such public utility for a compensation greater or less than prescribed in such schedules.

The Policy For The Extension of Underground Electric Distribution Facilities provides, in pertinent part:

7

Economic, physical and technical considerations normally dictate the use of overhead electric distribution facilities in the Company's Operating Area. *There are some circumstances, however, where it is feasible and practical for the Company to install portions of its distribution facilities underground.* There are other circumstances where the value to the property owners of having the electric distribution and service facilities installed underground will outweigh the added costs and other possible disadvantages of such installation. (emphasis added)

(Filed: July 2, 1986, effective date: August 14, 1986.) Entergy contends that PSC approval of the policy defining its rate has the force and effect of state law. Entergy relies on Miss. Code Ann. § 77-3-3(e) (defining rate) and ***Tucker v. Hinds County***, 558 So.2d 869, 875 (Miss. 1990) ("MP&L argues that these rules have the effect of law and there is authority that certain administrative rules have the force of law." (citing ***Standard Oil Co. of CA v. Johnson***, 316 U.S. 481, 484, 62 S.Ct. 1168, 1169-70, 86 L.Ed. 1611 (1942) (War Department regulations); *see also* ***United States v. Mississippi Power & Light Co.***, 638 F.2d 899 (5th Cir. 1981); ***Green v. United States***, 460 F.2d 412 (5th Cir. 1972)). Entergy also relies on a decision of the Mississippi Public Service Commission in Bounds Building Co., Inc., Bob Pigford and Robert Corey, and Mississippi Power Company, Docket No. 94-UA-0777, wherein the PSC held that a repealed ordinance of the City of Meridian requiring Mississippi Power Company to place distribution lines to new subdivisions underground at no cost to the subdivider improperly established the method to charge and the charge itself, both of which are within the exclusive, original jurisdiction of the PSC. Conversely, Ware asserts that the filed rate permits Entergy to place the high voltage lines underground, at its own expense, "where it is feasible and practical for the Company" to do so.

8

¶12. The question is whether the filed-rate doctrine is applicable to this case. Entergy relies on our decision in *American Bankers Ins. Co. of Florida v. Alexander*, 818 So.2d 1073, 1084-85 (Miss. 2001), for the proposition that the "filed-rate doctrine is applicable to cases in which a court is called upon to determine, either directly or indirectly, what a reasonable rate should be, or 'second guess' the rate making agency." In *Alexander*, we held that the filed-rate doctrine did not bar the plaintiffs' claims against a secured lender and collateral protection insurer in an action to recover for overcharged premiums.

¶13. We have addressed the filed-rate doctrine in but one other case since *Alexander*. We held:

> Under the filed rate doctrine, any "filed rate"--that is, a rate approved by the governing regulatory agency--is "per se reasonable and unassailable in judicial proceedings brought by ratepayers." *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir.1994); *United Gas Pipe Line Co. v. Willmut Gas & Oil Co.*, 231 Miss. 700, 718, 97 So.2d 530, 535 (1957) (petitioner "can claim no rate as a legal right that is other than the filed rate, whether fixed or merely accepted by the Commission, and not even a court can authorize commerce in the commodity on other terms") (quoting *Montana-Dakota Utils. Co. v. Northwestern Pub. Serv. Comm'n*, 341 U.S. 246, 251, 71 S.Ct. 692, 695, 95 L.Ed. 912 (1951)).

*American Bankers' Ins. Co. of Fla. v. Wells*, 819 So.2d 1196, 1203-04 (¶ 23) (Miss. 2001).

¶14. We find that the filed-rate doctrine does not apply here because the Policy does not prohibit Entergy from placing the high voltage lines underground at its own expense "where it is feasible and practical for the Company" to do so. We further find that the rate policy filed with the PSC does not prohibit Entergy from placing the high voltage lines underground at its own expense. Therefore, we are constrained to find that the trial court abused its discretion

9

by excluding evidence and testimony related to the feasibility of Entergy placing its power line underground.

### III. CAN A MISSISSIPPI PUBLIC SERVICE COMMISSION APPROVED POLICY SUPPLANT OR MODIFY ENTERGY'S DUTY TO MAKE AN INSTALLATION SAFE CONTRARY TO THIS COURT'S HOLDING IN *Entergy Mississippi, Inc. v. Burdette Gin Co.*, 726 So.2d 1202 (Miss. 1998)?

¶15. Ware next argues that Entergy's duty to make the installation of the high voltage line safe is not modified or supplanted by the PSC approved rate policy. Ware contends that regardless of what rate is charged to customers, Entergy still has to adhere to the duty of care set forth by this Court's decisions. In response, Entergy invites this Court to clarify the standard of care which it owes the general public in light of the legislative amendments subsequent to our decision in *Entergy Mississippi, Inc. v. Burdette Gin Co.*, 726 So.2d 1202 (Miss. 1998). In *Burdette Gin*, we held that public policy in Mississippi required utilities to exercise "a very high degree of care in protecting the public from the dangers of electricity" and that an indemnity clause approved by the PSC "was void as a matter of public policy, because it unnecessarily shielded Entergy from its own potential negligence in constructing and maintaining its electrical lines." *Burdette Gin*, 726 So.2d at 1208 (¶ 17).

¶16. In 2002, well after the underlying incident, the Mississippi Legislature amended Miss. Code Ann. § 11-27-43, to include a duty of care. As amended, the statute reads as follows:

(1) All companies or associations of persons incorporated or organized for the purposes set forth in Section 11-27-41 are authorized and empowered to erect, place and maintain their posts, wires and conductors along and across any of the public highways, streets or waters and along and across all turnpikes, railroads and canals, and also through any of the public lands, and to do such clearing as may be reasonably necessary for the proper protection, operation and maintenance of such facilities,

10

provided in all cases such authorization shall meet the requirements of the National Electrical Safety Code. The same shall be so constructed and placed as not to be dangerous to persons or property; nor interfere with the common use of such roads, streets, or waters; nor with the use of the wires of other wire-using companies; or more than is necessary with the convenience of any landowner.[3]

(2)     The duty of care owed to the public by owners and operators of public utility facilities located adjacent to a highway, road, street or bridge in this state is satisfied when:

(a)     With respect to state highways, the public utility facilities comply with the provisions of the applicable edition of the National Electrical Safety Code for structure placement relative to roadways.

Miss. Code Ann. § 11-27-43 (Supp. 2003). Entergy asserts that this amended statute overrules the standard set forth in *Mississippi Power & Light Co. v. Lumpkin*, 725 So.2d 721 (Miss. 1998).[4]

¶17.    Prior to our decision in *Lumpkin*, the standard of care placed on public utility companies in the maintenance of structures on the rights-of-way of public roads was that which was set forth in *Vines v. Southwestern Elec. Power Ass'n*, 241 Miss. 120, 129 So.2d 396 (1961). In *Vines*, a guest passenger was killed when the car which he occupied left the traveled portion of the road, went 150 feet in a ditch, and collided with a power line pole which was located approximately 4 feet from the traveled portion of the road. All four occupants of the

---

[3]Prior to the 2002 amendment, the statute ended here.

[4]As will be fully discussed later in this opinion, our decision in *Lumpkin* was by way of a plurality opinion. Also, we note that the 2002 amendment to Miss. Code Ann. § 11-27-43 (an eminent domain statute) became effective from and after July 1, 2002, and thus is not applicable to the case sub judice. We acknowledge the amended statute's existence and discuss it here since Entergy has discussed this amended statute in its brief.

11

car, including the driver, had been drinking beer. The light pole collapsed and the energized power line fell to the ground. Vines exited the vehicle, came into contact with the downed power line, and was electrocuted. In citing the predecessor statute to Miss. Code Ann. § 11-27-43, we stated, inter alia:

> In the case at bar the pole was not within that portion of the right-of-way designed for public travel and no one making the ordinary use of the road and exercising reasonable care and caution would travel where the pole was located.
> **********
> The general rule established by the modern authorities is that a public utility company lawfully maintaining a pole in or near a public highway is not liable for the damage to a person or property resulting from a vehicle striking such pole, unless it is erected on the traveled portion of the highway or in such close proximity thereto as to constitute an obstruction dangerous to anyone properly using the highway, and the location of the pole is the proximate cause of the collision.[5]
> **********
> Viewing the facts in the case at bar in the light most favorable to [the wrongful death beneficiaries], we are of the opinion that the sole proximate cause of the death of Richard Vines was the negligence of the driver of the automobile and the defect in the automobile. Even if the defect in the automobile made it difficult or impossible for the driver to steer the car, there was no reason whatsoever for him to continue traveling a distance of 150 feet outside the traveled portion of the road without ever applying his brakes. This was not a proper use of the highway.
> **********
> Of course, when they [power lines] are knocked down, they become dangerous, but danger is not synonymous with negligence; and where the danger results solely from the careless act of another in causing the power lines to be knocked down, as was the case here, we do not think the degree of care required makes it a jury case.
> **********
> We do not think the utility must guard against dangers resulting from vehicles leaving the traveled portion of the highway and knocking down the power poles, as already stated. Moreover, if the lines are knocked down, they must fall some place. If they had fallen on the automobile, the danger may have been greater. The fact that they fell in the highway was not the proximate cause of the

_____

[5]This is a quote from ***Clayborn v. Tennessee Electric Power Co.***, 20 Tenn. App. 594, 101 S.W.2d 492, 497 (1936).

death of Vines. The sole proximate cause was the manner in which the automobile was driven.

241 Miss. at 128-30, 129 So.2d at 399-400.

¶18.    In *Lumpkin*, the facts were remarkably similar to those in *Vines*. On a November night, Tackett, who admitted to having consumed "four or five beers" that night, was driving several passengers from Philip back to Greenwood on the Money Road. Tackett tried unsuccessfully to negotiate a curve in the road, leaving the roadway and severing a utility pole which caused the power lines to fall to the ground. One of the passengers, Kristen, exited the vehicle, unaware of the fallen power lines. Kristen was shocked upon coming in contact with the fallen power lines, but she miraculously survived; however, her injuries were severe – third degree burns to the left wrist and severe burns which extended from her wrist to her shoulder, and from her buttocks to her lower back area. She had very little flesh remaining on her left forearm. Kristen eventually endured four operations, including one to amputate her left arm, a portion of her left shoulder, and a portion of her chest. Because of the admittedly similar facts in *Lumpkin* and *Vines*, we were requested in *Lumpkin* by Mississippi Power and Light Company (MP& L), the owner of the power lines in question, to follow our prior decision in *Vines* and thus exonerate it from any liability for Kristen's injuries.

¶19.    In a plurality opinion,[6] we stated, inter alia:

---

[6] The jury had returned a verdict awarding damages to Kristen in the amount of $750,000; however, the jury found Kristen to be 50% at fault and MP&L to be 50% at fault. Remarkably, the jury assessed no fault against Tackett, the driver of the car. Justice Banks authored the plurality opinion, and he was joined by Presiding Justices Sullivan and Pittman. The plurality opinion reversed and remanded the judgment on the jury verdict because the trial court erroneously excluded evidence of Tackett's alcohol consumption on the night of the accident. Justice McRae, concurred in part and dissented in part, finding that the jury verdict should be affirmed in toto. Justice Smith concurred in part and dissented in part, finding

13

[W]e are asked to determine whether, under any circumstances, a utility company may be held liable for injuries sustained when an admittedly negligent driver collides with a pole constructed for the purpose of distributing electricity, when the pole is located within the public right-of-way off the main-traveled portion of a road.

MP& L argues that [*Vines*] answers the question as follows: if someone goes off the maintraveled portion of the road, thus taking the driver out of the category of drivers making *ordinary* or *common* use of the road, the utility company is not subject to liability. MP& L maintains that electric utilities are not required to place their poles in order to insure the safety of reckless drivers. According to MP&L, the reason it only has a duty of reasonable foreseeability *to those making a proper use of the road* is because predicting where reckless drivers such as Tackett will leave a roadway is always unforeseeable. In other words, MP&L suggests that it should not be charged with the responsibility of protecting against negligent drivers who collide with a pole that is located within the public right-of-way but off the main-traveled portion of the road.

725 So.2d at 726. The four-justice plurality in **Lumpkin** stated that it was overruling **Vines**,

and in so doing, held:

Today we adopt a standard which requires those who place structures in rights-of-way pursuant to the statute to exercise reasonable care under the circumstances for the safety of those making common use of the right- of-way. It shall not be a bar to liability that contact with the structure occurs only after the driver, through misfortune or ordinary negligence, has left the main traveled portion of the right of way. In determining whether the placement of a pole may be considered unreasonably dangerous such that liability may follow, the trial court should consider such factors as the structure's proximity to the roadway, the configuration of the roadway, whether the utility had notice of previous accidents of sufficient similarity to give reasonable notice of the danger, and whether there are feasible alternative locations for the structure which are less dangerous. *See* **McMillan** [*v. Michigan State Highway Comm'n*, 426 Mich. 46], 393 N.W.2d [332]at 339 [1986]; **Scheel v. Tremblay**, 226 Pa.Super. 45, 312 A.2d 45, 46 (1973).

**Lumpkin**, 725 So.2d at 730 (¶ 44).

that *Vines* should not be overruled and thus finding that the judgment on the jury verdict should be reversed and rendered based on *Vines*. Justice Smith was joined in his separate opinion by Chief Justice Prather and Justice Roberts. Two justices did not participate, thus **Lumpkin** was decided on a 4-3 vote.

¶20. We could go further in addressing what precedential value we should afford the plurality decision in *Lumpkin*, wherein four justices of this Court voted to overrule *Vines*, and adopt a new standard as to the duty of utility companies in the placement of their poles or other structures on the road rights-of-way. However, because of the herein discussed inapplicability of *Lumpkin* and *Vines* to the case sub judice, we save that issue for another day.

¶21. We again mention, as already noted, that while the facts in both *Vines* and *Lumpkin* are quite similar, the facts in the case sub judice, by comparison, are on the other hand quite different. Today we are not confronted with intoxicated automobile drivers traveling off the road and clipping light poles on the right-of-way, thus causing downed power lines, and guest passengers exiting the vehicles and coming into contact with the downed power lines. Instead, we are confronted today with facts revealing construction workers presumably experienced in working with, and in close proximity to, energized powers lines, while working on MDOT's damaged underground power line, bringing a metal light pole into contact with a clearly visible Entergy overhead power line – a power line which remained energized because no one ever put Entergy on notice that repair work would be performed that day in an area in close proximity to its overhead power line.

¶22. Entergy argues that the duty of care is met by compliance with the National Electrical Safety Code (NESC) and not compliance with NESC as well as reasonable care. Entergy asserts that because it met, or even exceeded, the NESC horizontal and vertical clearances, Entergy cannot be held liable in this instance due to the overhead placement of the high voltage lines. We find these assertions to be without merit. "Public policy in Mississippi requires utilities to exercise a very high degree of care in protecting the public from the dangers of

15

electricity." ***Burdette Gin***, 726 So.2d at 1208 (¶ 17); ***Miss. Power & Light Co. v. Shepard***, 285 So.2d 725, 729 (1973). There is also a duty on power companies to anticipate and guard against events which may be reasonably expected to occur, and the failure to do so is negligence, even though the power company may not anticipate the identical injury that occurs. ***Id.*** at 729 (*citing* 29 C.J.S. Electricity § 38, at 1058-59 (1965)).

¶23.    Miss. Code Ann. § 11-27-43, both before and after the 2002 amendment, requires, inter alia, that (1) the NESC requirements are met, (2) the poles are constructed and placed as not to be dangerous to persons or property, (3) there is no interference with the common use of such roads, streets, waters, or with the use of the wires of other wire-using companies, and (4) the construction does not unnecessarily inconvenience any landowner. Subsection (1) of Miss. Code Ann. § 11-27-43 remains unchanged as it has at least since the adoption of the 1972 code.[7]    Even today, the Legislature still places on the public utility companies the responsibility of the placement and maintenance of its poles and wires in compliance with NESC in such a way as to "not be dangerous to persons.........nor interfere...........with the use of the wires of other wire-using companies...." Miss. Code Ann. § 11-27-43(1) (Supp. 2003).

¶24.    The NESC provides minimum guidelines and "the basic provisions that are considered necessary for the safety of employees and the public under the specified conditions" but are "not intended as a design specification or as an instruction manual." NESC, Section 1, ¶ 010. We have previously recognized that a violation of the minimum standards established by the NESC constitutes negligence per se. *See* ***Gifford v. Four-County Elec. Power Ass'n***, 615

---

[7]As noted in the amendment notes in the current code supplement, the 2002 amendment "designated the former paragraph as (1) and added (2) through (4)."

So.2d 1166, 1173 (Miss. 1992). We have held that there is no negligence per se for a utility company who has complied with the minimum safety standards of the NESC but that compliance is not conclusive as to the question of due care under particular circumstances. *Galloway v. Singing River Elec. Power Ass'n*, 247 Miss. 308, 152 So.2d 710, 712 (1963).

¶25. We find that even prior to the 2002 amendment, the Legislature intended that compliance with NESC is sufficient, so long as the compliance does not render a dangerous situation to persons or property, nor interfere with the common usage of roads, streets, or highways, nor interfere with the use of the wires of other wire-using companies. Thus, it is appropriate to submit to the jury the issue of whether Entergy's placement of these uninsulated high voltage lines in 1996 complied with Entergy's duty of care as set out herein by statute and the NESC, when read in pari materia, as well as our case law.

**IV.   IS THE INTERNAL MEMO PRODUCED BY ENTERGY DATED SEPTEMBER 9, 1996, ADMISSIBLE UNDER M.R.E. 401 and M.R.E. 402 ON THE SUBJECT OF ENTERGY'S CONSIDERATION OF FEASIBLE ALTERNATIVE LOCATIONS FOR ITS ELECTRICAL LINES WHICH WERE LESS DANGEROUS IN ACCORD WITH THE DECISION IN *Mississippi Power & Light Company v. Lumpkin*, 725 So.2d 721 (Miss. 1998)?**

¶26. While we have reversed the trial court's grant of the motion in limine concerning Entergy's standard of care, we feel compelled to address the separate issue of the admissibility of the Entergy internal memorandum which Ware proposes to offer into evidence on the standard of care issue. In moving to have the Entergy internal memorandum excluded, Entergy asserted that the memo was inadmissible under M.R.E. 401 and 402. The memorandum, written by Forest Persons, on September 9, 1996, stated, inter alia (1) that in essence it was nothing more than a status report on the Canal Street Project in Natchez; (2) that MP&L had

17

agreed "in part" to do certain things (we do not know what MP&L had agreed <u>in part</u> to do); (3) that certain proposals ("non binding talking points") had been made to the city engineer; and (4) that both Persons and the city engineer had agreed that they had no authority to make any binding decisions.

¶27.    Ware asserts that this Entergy memorandum indicates that Entergy was willing to place the high voltage line underground at its own expense at the same location where the electrocution took place.

¶28.    Entergy asserts that the memorandum is not admissible under M.R.E. 401 and 402. M.R.E. 401 states:

> "Relevant Evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

M.R.E. 402 states:

> All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of the State of Mississippi, or by these rules. Evidence which is not relevant is not admissible.

¶29.    Ware counters that Entergy had placed at issue the underground installation as a feasible alternative through the affidavit of Phil Tigrett and the expected testimony of Entergy's expert Allen L. Capp.  We disagree. First of all, this internal memorandum is not relevant to the issues before the trial court, and ultimately the jury.  Additionally, one important part of the equation is missing.  While M.R.E.  401 and 402 are certainly critical to our discussion, and assuming *arguendo* that this internal memorandum is relevant, M.R.E. 403 is the ultimate filter through which all evidentiary objections eventually flow.  M.R.E. 403 states:

18

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Simply because there may have been discussions and consideration given to the possible underground installation of power lines by Entergy is of no moment as to the issue of whether Entergy violated the appropriate standard of care in the overhead installation of its power lines on Highway 84 leading to the Mississippi River bridge. When reading this internal memorandum in its entirety, it is obvious that it could clearly mislead the jury as to the legal obligations of Entergy, and thus any probative value of this supposed relevant evidence would be outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury. *Yoste v. Wal-Mart Stores, Inc.*, 822 So.2d 935, 937 (Miss. 2002).

While the filed rate policy does not prohibit Entergy from placing the distribution line underground and Entergy's employee may have expressed an opinion in an internal memorandum that underground placement of the power lines was a feasible alternative, the memorandum is not relevant to the issues before the trial court, and, even if relevant, this internal memorandum is inadmissible when performing the required balancing test under M.R.E. 403. The trial court thus did not abuse its discretion in finding that the Persons memorandum was inadmissible.

## CONCLUSION

¶30. For the foregoing reasons, the trial court's grant of Entergy's motion in limine relating to the submission of fault of the immune employer to the jury is affirmed. While we reverse the trial court's grant of Entergy's motion in limine relating to the feasibility of placing the

19

high voltage power lines underground, we do hold that the Persons internal memorandum on this issue is not admissible. Thus, this cause is remanded to the Circuit Court of Adams County for further proceedings in accordance with this opinion.

¶31.   **AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.**

**PITTMAN, C.J., SMITH, P.J., WALLER AND COBB, JJ., CONCUR. GRAVES, J., CONCURS IN RESULT ONLY. EASLEY, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. McRAE, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION. DIAZ, J., NOT PARTICIPATING.**

**McRAE, PRESIDING JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶32.   Notwithstanding my agreement with the majority as to issues II and III, my disagreement with the decisions rendered as to issues I and IV prevent me from full concurrence. Accordingly, I concur in part and dissent in part.

*Law At Time of Accident Controls*

¶33.   In its examination of the allocation of fault to an immune employer, the majority has once again demonstrated the zealousness with which it is anticipating the several reforms implemented by the Legislature in 2002. As we have seen in previous cases and will see for the foreseeable future, the majority has a fascination with citing these measures as persuasive or, as they have apparently done today, simply for the sake of doing so. However, it takes little imagination or insight to observe the almost controlling weight they are given, even cases such as the one before us, where the amendments are inapplicable.

¶34.    This case provides yet another example of this tactic.   Instead of simply citing to the portion of *Mack Trucks, Inc. v. Tackett,* 844 So.2d 1107 (Miss. 2003), (*Mack Trucks II*), where we held that fault was attributable to an immune employer, the majority has included a portion of Miss. Code Ann. §  85-5-7(Supp. 2003) wherein the Legislature changed the law regarding joint and several liability.

¶35.    I raise this issue only to point out that *Mack Trucks II* actually involved the allocation of fault to an immune party and the impact that allocation would have on the joint and several liability of other defendants.   There, despite an acknowledgment that the rules regarding joint and several liability had been changed since the initiation of the suit, we reiterated that the non-immune defendants were jointly and severally liable for up to 50% of the verdict even if they possessed only a single percentage of fault. See *id*. at 1115-16.   We stated "[w]hatever the equity or inequity of the result... that was the law at the time of the accident, and that is the result we are bound to impose." *Id*.

*Relevant Evidence*

¶36.    The majority finds it appropriate to submit to the jury the issue of whether Entergy's placement of the uninsulated  high voltage lines in 1996 complied with Entergy's duty of care.  However, the majority finds one of the most crucial pieces of evidence, Entergy's  internal operating memorandum, inadmissible because it is not relevant.   This holding is disingenuous.

¶37.    The internal memorandum, presumably written in 1982, indicates that Entergy planned to " [p]lace all facilities in the downtown area underground by December 31, 1996."   This plan of action was "deleted" by Mr. Persons in 1984, saving Entergy "several million dollars."   The location in which the electrocution took place would have had underground wiring if the plan

21

had not been "deleted." The internal memorandum is evidence that economic value was placed first, before issues of safety, indicating the duty of care was breached. Therefore, the internal memorandum is relevant evidence that a jury should be allowed to weigh when determining if Entergy's placement of the power line is a danger to any companies that work near the power line.

¶38. The majority relies heavily on Miss. Code Ann. § 11-27-43(1) (Supp. 2003) in which the utilities must not only meet the requirements of the NESC but are also responsible for constructing, placement, and maintenance of its posts, wires and conductors as such "not to be dangerous to persons or property; nor interfere with the common use of such roads, streets, or waters; **NOR** with the use of the wires of **OTHER** wire-using companies...." (emphasis added). Notwithstanding, the majority states that the evidence is not relevant under M.R.E. 401 and 402 based on the premise that M.R.E. 403 trumps both M.R.E. 401 and 402 in that it "is the ultimate filter through which all evidentiary objections eventually flow."

¶39. Citing *Yoste v. Wal-Mart Stores, Inc*. 822 So.2d 935, 937 (Miss. 2002), the majority offers that the jury would be misled (if it were to read the internal memorandum in its entirety) as to the legal obligations of Entergy and, therefore, not only confuse the issues but also prejudice Entergy by placing legal obligations upon it which it did not have. However, the majority already made clear that the obligations and "duty" owed under Miss. Code Ann. § 11-27-43(1) did not interfere with other wire-using companies. This imposes a duty of safety for other workers in the field, which Entergy failed to comply with as it based its decision on not installing the wires underground on economic reasons and foregoing safety concerns. Thus, this issue under M.R.E. 403 should go to the jury.

22

¶40. As the trier of fact, it is for the jury to decide whether Entergy breached the applicable standard of care. Any relevant evidence will be biased because that is the purpose of presenting the information on their point. Entergy placed this in issue and if it chose because of economic value ( and not safety factors) not to put the wiring underground, then it is relevant evidence to present to a jury for its consideration in making its final decision.

¶41. Additionally, the relevance of Entergy's internal memorandum and like information would be enhanced were the defendant's experts to testify as to the standard of care. This would "open the door" for cross examination as to the defendant's knowledge and whether they considered alternatives to the actions that were eventually taken.

¶42. In summation, I wish to note my disagreement with this Court's treatment of *Mississippi Power & Light Co. v. Lumpkin*, 725 So.2d 721 (Miss. 1998) wherein we overruled this Court's earlier decision of *Vines v. Southwestern Elec. Power Ass'n*, 129 So.2d 396 (1961). The *Lumpkin* Court overruled *Vines*, and this Court should appropriately do the same.

¶43. Accordingly, I concur in part and dissent in part.